ORAL ARGUMENT NOT YET SCHEDULED
No. 22-1210 and Consolidated Cases
―――

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

SINCLAIR WYOMING REFINING COMPANY LLC, ET AL.,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*.

ON PETITIONS FOR REVIEW OF FINAL AGENCY ACTION
OF THE ENVIRONMENTAL PROTECTION AGENCY

**INITIAL REPLY BRIEF OF AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS; SINCLAIR WYOMING REFINING COMPANY LLC
& SINCLAIR CASPER REFINING COMPANY LLC; THE SAN ANTONIO
REFINERY LLC; WYNNEWOOD REFINING COMPANY, LLC; AND
THE SMALL REFINERIES COALITION**

Robert J. Meyers
Elizabeth B. Dawson
Siyi Shen
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2789
*Counsel for Petitioner American Fuel
& Petrochemical Manufacturers*

Jonathan G. Hardin
LeAnn Johnson
Alexandra Magill Bromer
PERKINS COIE LLP
700 Thirteenth Street, NW, Suite 800
Washington, D.C. 20005-3960
(202) 654-6200
*Counsel for Petitioners Small
Refineries Coalition and The San
Antonio Refinery LLC*

Jeffrey R. Holmstead
Brittany M. Pemberton
BRACEWELL LLP
2001 M Street, NW
Suite 900
Washington, DC 20036-3389
(202) 828-5800
brittany.pemberton@bracewell.com
*Counsel for Petitioners Sinclair
Wyoming Refining Company LLC and
Sinclair Casper Refining Company
LLC*

[Additional counsel listed on inside cover]

Richard S. Moskowitz
Tyler J. Kubik
American Fuel & Petrochemical
Manufacturers
1800 M Street, NW, Suite 900N
Washington, DC 20036
*Counsel for Petitioner American Fuel
& Petrochemical Manufacturers*

Samuel P. Hershey
Thomas E Lauria
Andrew K. Gershenfeld
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-2699
*Counsel for Petitioner
Wynnewood Refining Company, LLC*

# TABLE OF CONTENTS

GLOSSARY .......................................................................................... vii

SUMMARY OF ARGUMENT ................................................................1

ARGUMENT ...........................................................................................2

I.    EPA's Application of the Reset Criteria to Derive the 2022 Standard Was Arbitrary and Capricious. ........................................................2

    A.    EPA's Advanced and Total Renewable Fuel Estimates Contravene the Reset Mandate. .............................................3

    B.    Refiners Have Standing to Challenge EPA's Inadequate Environmental Analysis. ....................................................10

II.    EPA's Reallocation Rule Contravenes the Statute. .......................12

III.    EPA's Supplemental Standard Is Unlawful. .................................16

CONCLUSION .....................................................................................20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFPM v. EPA,*
   937 F.3d 559 (D.C. Cir. 2019)................................................................12, 15

*Am. Fed'n of Gov't Emps. v. FLRA,*
   25 F.4th 1 (D.C. Cir. 2022)....................................................................12, 15

*Ams. for Clean Energy v. EPA,*
   864 F.3d 691 (D.C. Cir. 2017)....................................................................17

*Bates Cnty. Mem'l Hosp. v. Azar,*
   464 F. Supp. 3d 43 (D.D.C. 2020)..............................................................14

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
   140 S. Ct. 1891 (2020)..................................................................................5

*Engine Mfrs. Ass'n v. EPA,*
   88 F.3d 1075 (D.C. Cir. 1996)....................................................................14

*Entergy Corp. v. Riverkeeper, Inc.,*
   556 U.S. 208 (2009)....................................................................................13

*Growth Energy v. EPA,*
   5 F.4th 1 (D.C. Cir. 2021)....................................................................11, 12

*Heartland Reg'l Med. Ctr. v. Sebelius,*
   566 F.3d 193 (D.C. Cir. 2009), and EPA .................................................18

*Judulang v. Holder,*
   565 U.S. 42 (2011)........................................................................................7

*Maine Lobstermen's Association v. National Marine Fisheries
Service,*
   70 F.4th 582 (D.C. Cir. 2023)..............................................................13, 14

*Mozilla Corp. v. FCC,*
   940 F.3d 1 (D.C. Cir. 2019)......................................................................5, 10

iv

*Neustar, Inc. v. FCC*,
857 F.3d 886 (D.C. Cir. 2017) ............................................................14

*RFS Power Coalition v. EPA*,
No. 20-1046 (consolidated) (D.C. Cir. Jan. 29, 2021) ........................15

*Small Refiner Lead Phase-Down Task Force v. EPA*,
705 F.2d 506 (D.C. Cir. 1983) ............................................................10

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ..............................................................................4

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014) ............................................................13

**Statutes**

42 U.S.C. §7545(*o*)(2)(B)(i) ......................................................................4

42 U.S.C. §7545(*o*)(2)(B)(ii) ...............................................................4, 6, 7

42 U.S.C. §7545(*o*)(2)(B)(ii)(IV) ..............................................................8

42 U.S.C. §7545(*o*)(3)(B)(i) ......................................................................6

42 U.S.C. §7545(*o*)(7)(A)(i) ....................................................................11

42 U.S.C. §7545(*o*)(7)(D)(i) ....................................................................18

42 U.S.C. §7545(*o*)(7)(F) ...........................................................................5

42 U.S.C. §7545(*o*)(7)(F)(i) .......................................................................3

42 U.S.C. §7607(b)(1) ...............................................................................12

42 U.S.C. §7607(d)(3) .................................................................................7

42 U.S.C. §7607(d)(9)(A) .....................................................................1, 10

**Other Authorities**

80 Fed. Reg. 77420 (Dec. 14, 2015) ........................................................18

84 Fed. Reg. 36762 (July 29, 2019) ..........................................................18

86 Fed. Reg. 72436 (Dec. 21, 2021) ........................................................................5, 11

87 Fed. Reg. 39600 (July 1, 2022)..................................................3, 7, 9, 10, 14, 16

*Calumet Shreveport Refin. v. EPA*,
    No. 22-60266 (consol.) (5th Cir. Jan. 27, 2023), Doc. 209-1 ...............................9

*Hunt Refin. Co. v. EPA*,
    No. 22-12535 (11th Cir. Dec. 27, 2022), Doc. 33 ................................................9

*Sinclair Wyo. Refin. Co. v. EPA*,
    No. 22-1073 (consol.) (D.C. Cir. Mar. 30, 2023), Doc. 1992426 ........................9

# GLOSSARY

| | |
|---|---|
| Biofuel Intervenors | Clean Fuels Alliance America, Growth Energy, & Renewable Fuels Association |
| Biofuel Br. | Initial Brief of Biofuel Intervenors Responding to Obligated Party Petitioners, Doc. No. 2012194 |
| EPA or Agency | U.S. Environmental Protection Agency |
| EPA Br. | Initial Brief for Respondent United States Environmental Protection Agency, Doc. No. 2009125. |
| ESA | Endangered Species Act |
| JA | Joint Appendix |
| Refiners Br. | Initial Brief of American Fuel & Petrochemical Manufacturers; Sinclair Wyoming Refining Company LLC & Sinclair Casper Refining Company LLC; The San Antonio Refinery LLC; Wynnewood Refining Company, LLC; and the Small Refineries Coalition, Doc. No. 1992554 |
| RFS | Renewable Fuel Standard |
| RINs | Renewable Identification Numbers |
| 2020-2022 Proposed Rule or Proposed Rule | "Renewable Fuel Standard (RFS) Program: RFS Annual Rules," 86 Fed. Reg. 72436 (Dec. 21, 2021) |
| 2022 Standard | The portion of the 2020-2022 Rule "Renewable Fuel Standard (RFS) Program: RFS Annual Rules," 87 Fed. Reg. 39600 (July 1, 2022)) applicable to 2022. |

# SUMMARY OF ARGUMENT

EPA's 2022 Standard, reallocation decision, and supplemental standard are arbitrary and capricious. EPA responds to Petitioners' ("Refiners"[1]) brief with *non sequitur* and deflection; neither approach suffices to uphold EPA's decisions.

First, EPA inappropriately applied the statutory "reset" criteria for the 2022 Standard. EPA began with the statutory tables as baseline volumes instead of looking to actual RFS program performance, as the statute requires. EPA also over-weighted some criteria while downplaying others, and inadequately explained the result. For their part, Biofuel Intervenors advocate a revisionist version of events that the Agency does not advance—that EPA was bound only to reset the cellulosic biofuel standard and therefore lacked discretion as to the rest. And EPA and Biofuel Intervenors' attempt to disentangle EPA's noncompliance with the Endangered Species Act ("ESA") from its statutory duty to analyze the impact of renewable fuels on the environment strains credulity. EPA's ESA noncompliance renders the 2022 Standard "not in accordance with law" under the Clean Air Act, 42 U.S.C. §7607(d)(9)(A),[2] under which Refiners have standing.

---

[1]     Biofuel Intervenors refer to Petitioners as "Obligated Parties" in the title of their brief but "Refiners" in the brief, and EPA refers to Petitioners as "Refiners." To avoid confusion, Petitioners adopt EPA's designation of "Refiners."

[2]     Unless otherwise noted, all statutory citations are to Title 42, U.S. Code.

Second, EPA unlawfully re-promulgated a formula reallocating exempted parties' obligations to non-exempt obligated parties. EPA professes that this is not novel, because its old percentage-standard formula reallocated *actual* exempted volumes; but EPA has identified no statutory authority to reallocate the *projected hypothetical* exemptions at issue here. And even if such authority existed, EPA failed to justify its policy shift.

Third, EPA erroneously added a 250-million-gallon "supplemental" volume to the 2022 Standard, foisting EPA's error in 2016 onto 2022's obligated parties. In remanding the 2016 standard, this Court did not mandate EPA's approach; EPA cannot hide behind this Court's decision to justify its action. EPA gave short shrift to other options at its disposal, resulting in an arbitrary and capricious decision.

The Court should vacate and remand.

## ARGUMENT

## I. EPA's Application of the Reset Criteria to Derive the 2022 Standard Was Arbitrary and Capricious.

The reset mandate, compelled by the RFS program's inability to achieve Congress's goals, requires EPA to promulgate *new* standards that reflect how the RFS program has fared in the real world. While EPA acknowledges its statutory duty to reset volumes (as it must), EPA erroneously clings to past approaches in setting the 2022 Standard.

## A. EPA's Advanced and Total Renewable Fuel Estimates Contravene the Reset Mandate.

EPA's response to Refiners' arguments regarding the inadequacy of EPA's advanced and total renewable fuel estimates is notable for what it does *not* say. First, EPA has no answer for its blithe dismissal of its obligation to assess the impacts of the rule. Refiners Br. 14. Second, EPA does not—because it cannot—deny that it set standards that exceed what the Agency projected would be consumed in 2022. *Id.*; *see also, e.g.*, JA__[87_Fed._Reg._39624].

Meanwhile, Biofuel Intervenors' arguments all hinge on a single, flawed premise: that EPA was bound *only* to reset the cellulosic biofuel volume.[3] Biofuel Br. 1. But as EPA makes clear, "[w]ith the promulgation of the 2019 standards, these [reset] conditions have been met for three categories of biofuel: cellulosic biofuel, advanced biofuel, and total renewable fuel." JA__[87_Fed._Reg._39606]; EPA Br. 12. The statute's plain language requires EPA to reset all three. §7545(*o*)(7)(F)(i). Further, Biofuel Intervenors' resort to the purported duty to "ensure … the set" volumes are met, e.g., Biofuel Br. 4 (citation omitted), is irrelevant to the evaluation of the adequacy of EPA's resetting volumes in the first instance.

1. Regarding EPA's overall approach to resetting volumes, EPA refutes a strawman argument: that EPA "was not statutorily authorized to consider the

---

[3]   It is notable that Biofuel Intervenors' position appears to contradict, rather than support, EPA's decision in this regard.

original statutory volumes under its reset authority." EPA Br. 49. What Refiners actually argued was that it was irrational for EPA to consider the statutory volumes as the default starting point for its reset analysis. Refiners Br. 15. Indeed, the reset provision directs EPA to the criteria for the post-2022 "set" rules, §7545(*o*)(2)(B)(ii), conspicuously *not* referencing the statutory tables, §7545(*o*)(2)(B)(i). Similarly, Biofuel Intervenors argue that "tethering future standards to past performance ignores the RFS's purpose," Biofuel Br. 8—but to the contrary, considering the "implementation of the program" is precisely what Congress requires, §7545(*o*)(2)(B)(ii). And the implementation of the program has revealed that the statutory tables are not tethered to reality.

EPA also contends that the reset provision admits only modest adjustments, citing the dictionary definition and recent Supreme Court interpretation of "modify," EPA Br. 49, but ignoring the statutory context. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("reasonable statutory interpretation must account for both the specific context in which language is used and the broader context of the statute as a whole" (cleaned up)). Moreover, this litigating position contrasts markedly with EPA's Response to Comments, where EPA maintained that the dictionary definition "is of limited relevance because Congress provided specific guidance to the agency on the nature of the modification." JA__[RTC_10]. EPA's new position is an impermissible *post hoc* rationalization. *See Dep't of Homeland Sec. v. Regents of the*

*Univ. of Cal.*, 140 S. Ct. 1891, 1909-10 (2020) ("An agency must defend its actions based on the reasons it gave when it acted."); *see also Mozilla Corp. v. FCC*, 940 F.3d 1, 62 (D.C. Cir. 2019).

Regardless, the reset is triggered when EPA has waived an applicable-volume requirement by 20% for two consecutive years or by 50% for one year, §7545(*o*)(7)(F); in other words, when statutory volumes prove to be unattainable by a wide margin. Here, the conditions compelling statutory-volume waivers of nearly all cellulosic biofuel since 2010, over 20% of advanced biofuel every year since 2014, and over 20% of total renewable fuel since 2018, JA__[86_Fed._Reg._72442-3], can hardly be interpreted to require "minor" or "moderate" tinkering. Rather, the large and persistent percentage waivers represent drastic departures from Congress's original statutory volumes. Whatever "modify" means in other contexts, here, where Congress established concrete thresholds for modifying future volumes, it makes little sense for EPA to cling to the statutory tables as the default.

Nor do Refiners argue that tardiness requires EPA to disregard the statutory factors entirely, *contra* EPA Br. 54. Rather, the rule should reflect actual volumes used for that *portion* of the year to which the rule can no longer prospectively apply. Refiners Br. 19. The circumstances warranting the use of actual volumes for 2022 are even more compelling than in prior years, for where prior annual rules required only one month of lead time, EPA was to promulgate this rule *14 months* in advance.

*Compare* §7545(*o*)(3)(B)(i) *with* §7545(*o*)(2)(B)(ii). EPA responds that it considered actual volumes by projecting growth in RIN generation based on data from the first three months of 2022. EPA Br. 55. But EPA does not explain why, when finalizing the 2022 Standard at the end of June 2022, EPA limited its consideration of actual volumes to the first three months of the year.[4] And EPA concedes that "simple rate of growth projection may not capture the complexities of renewable fuel production and use in 2022." JA__[RTC_134].

Finally, EPA has no substantive response to Refiners' argument that EPA failed to explain how it reconciled the 2022 Standard's imbalance of costs and benefits. Refiners Br. 21-22. EPA points to a 320-page regulatory impact analysis, EPA Br. 60-61, challenging the Court to find the explanation. But Refiners identified a specific, vast disparity—$7 billion in costs vs. just $300 million in benefits—that remains unjustified. Refiners Br. 21-22. This is not a disagreement about "calibration of a line drawn," *contra* EPA Br. 61 (citation omitted). This is about EPA's repudiation of any duty to calibrate.

2.      As to advanced biofuels, EPA misconstrues Refiners' arguments with regard to imports—Refiners do not argue that it was EPA's *intent* to force reliance on imports though its estimates, *contra* EPA Br. 46, but EPA acknowledged that

---

4       For example, July 2023 data is currently available on EPA's website: https://www.epa.gov/fuels-registration-reporting-and-compliance-help/spreadsheet-rin-generation-and-renewable-fuel (last updated Aug. 17, 2023).

would be the *result*, JA__[87_Fed._Reg._39611]. EPA failed to square that known result with the energy security-enhancing purpose of the statute. As to cost, EPA explains several factors that counsel in favor of *lowering* the advanced biofuel standard—cost, carryover RIN bank size, feedstock diversions, JA__, __[87_Fed._Reg._39611, 39623]—but does not explain why other factors it believes favor increasing the standards so outweigh those that EPA would set a standard "represent[ing] significant growth compared to historical volumes and compared to the volumes of these fuels used in 2020 and 2021." JA__[87_Fed._Reg._39623]. EPA believes factors like cost "are outweighed by other factors (such as climate change)," JA__[87_Fed._Reg._39623], but doesn't explain, as it must, *why*. §7607(d)(3). The reset provision requires EPA to consider a wide range of criteria, §7545(*o*)(2)(B)(ii), and EPA had to explain how it reconciled *all* of these with its ultimate conclusions, particularly where it monetized some impacts but not others. Refiners Br. 21-22. Here, EPA could just as easily (indeed, more easily) have gone the other way, given the explanation provided. Reasoned decisionmaking requires more than a result that might as well be a coin-flip. *See Judulang v. Holder*, 565 U.S. 42, 55 (2011).

3. For total renewable fuel, EPA's misguided approach to applying the reset criteria is apparent in its claim that it could use the RFS to "incentivize the continued expansion of the infrastructure necessary" to support increased ethanol

blends. EPA Br. 53 (citation omitted). EPA gets it precisely backwards: The statute requires EPA to assess "the impact of renewable fuels *on*" U.S. infrastructure, "including deliverability of … products *other than* renewable fuel," and "the sufficiency of infrastructure to deliver and use renewable fuel." §7545(*o*)(2)(B)(ii)(IV) (emphasis added). This reflects Congress's concern that mandates could be *too high* due to infrastructure limitations, not that EPA should use the RFS to unilaterally incentivize renewable fuel infrastructure. Particularly when resetting volumes, these criteria require EPA to exhibit restraint and reasonably balance statutory concerns, not to ratchet *up* requirements.

Additionally, EPA cobbles together quotes from different sentences in Refiners' brief to assert something that Refiners did not—that EPA actually set a minimum volume for corn starch ethanol. EPA Br. 51. Rather, Refiners explained that EPA used an "implied statutory volume" for conventional renewable fuel of 15 billion gallons to set percentage standards. *Compare* EPA Br. 51 *with* Refiners Br. 15-16. And as EPA acknowledges, "[t]he predominant form of biofuel used to meet the standards under the RFS program, and in particular the total renewable fuel standard, has been ethanol."[5] JA__[RIA_29]. It is the use of such an implied

---

[5]      Refiners reference the definition of "conventional biofuel," i.e., "ethanol derived from corn starch," to contrast with the definition of cellulosic biofuel vis-à-vis Congress's specification for the minimum percentage of advanced biofuel for 2022. Refiners Br. 16.

statutory volume in the analysis for the remainder of the standards that is wrong, because it establishes an arbitrary and unreasoned starting point for EPA's analysis and inappropriately tips the scales in favor of higher total renewable fuel requirements. At the same time, EPA does not deny that 15 billion gallons of conventional renewable fuel have never been used. Refiners Br. 18 (quoting JA__[87_Fed._Reg._39612]). Nor does EPA explain how a volume calculated from statutory levels that have been *proven infeasible* is relevant to resetting standards. EPA just points to "various reasons" attempting to explain why 15 billion gallons were not used in years past. JA__[RTC_126]. EPA's only reason for why such conditions will not recur is that EPA currently plans no longer to grant small refinery exemptions (on grounds the Fifth, Eleventh, and D.C. Circuits have each found is "likely" unlawful).[6] But estimated volumes influence percentage standards, whether or not an individual small refinery ends up receiving an exemption. For a non-exempt refiner, the source of the error makes no difference—if EPA has estimated too high, the percentage standard will be too high and, if required to be satisfied using non-ethanol fuels, too costly. Ultimately, EPA fails to explain why, if "there

---

[6]     *See Calumet Shreveport Refin. v. EPA*, No. 22-60266 (consol.) (5th Cir. Jan. 27, 2023), Doc. 209-1, at 8 ("EPA's 'new interpretation'—which quite possibly will read the exemption framework promulgated by Congress out of the statute entirely, such that no small refinery will ever qualify for one—is thus likely contrary to law."); *Hunt Refin. Co. v. EPA*, No. 22-12535 (11th Cir. Dec. 27, 2022), Doc. 33; *Sinclair Wyo. Refin. Co. v. EPA*, No. 22-1073 (consol.) (D.C. Cir. Mar. 30, 2023), Doc. 1992426.

is no conventional renewable standard under the statute" as EPA admits, JA__[RTC_125], an implied 15 billion gallons (which appears nowhere in the enumerated statutory criteria) should be used to reset statutory levels.

## B. Refiners Have Standing to Challenge EPA's Inadequate Environmental Analysis.

Refiners do not allege a separate violation of the ESA. Refiners' argument arises solely under the Clean Air Act under which, as EPA acknowledges, Refiners have standing to challenge the 2022 Standard. EPA Br. 58-59. Refiners expressed concern with the legal viability of the 2022 Standard because EPA continues to avoid its duty under the ESA. *E.g.*, JA__-__[AFPM_Comment_7-8]. That is all, and that is enough. *See Mozilla*, 940 F.3d at 46-47.

Under the Clean Air Act, EPA must promulgate regulations "in accordance with law." §7607(d)(9)(A). The ESA is a law. EPA therefore cannot credibly claim that the 2022 Standard is on solid legal footing where it concedes it did not fully comply with its ESA duties when promulgating the 2022 Standard. JA__[87_Fed._Reg._39606]. Much like a failure to undertake a Regulatory Flexibility Act error undermines the agency decision it supports, *see Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 539 (D.C. Cir. 1983), so too here with the ESA. Indeed, in the context of the 2019 RFS rule, environmental petitioners challenged both EPA's ESA compliance and EPA's decision not to invoke the RFS program's severe environmental harm waiver. *See*

§7545(*o*)(7)(A)(i). This Court ruled that "[b]ecause EPA's [ESA] effects determination is defective, its decision regarding severe environmental harm, which rests on the same faulty analysis, is also arbitrary and capricious." *Growth Energy v. EPA*, 5 F.4th 1, 34 (D.C. Cir. 2021). EPA's failure to complete ESA consultation is at least as "faulty," and therefore equally dispositive.

While EPA claims to have sufficiently evaluated environmental impacts under the reset criteria, EPA Br. 56, EPA's conclusion regarding wildlife, in particular, was unsatisfactory: "we cannot confidently estimate the impacts to date on wildlife from biofuels generally nor from the annual volume requirements, specifically." JA__[RIA_107]. In the Proposed Rule, EPA stated it was "evaluating whether any federally listed threatened or endangered species *or their critical habitat* are likely to be adversely affected[.]" JA__[86_Fed._Reg._72442] (emphasis added). But in a memorandum to the docket for the final rule, EPA explained it merely "had *begun consideration* of the impact of the rule on endangered and threatened species." EPA Br. 59 (emphasis added). Obviously, an Agency cannot have completed a task it has only just "begun." EPA violated the CAA in finalizing the 2022 Standard without completing ESA consultation. *See Growth Energy*, 5 F.4th at 34.

## II.    EPA's Reallocation Rule Contravenes the Statute.[7]

EPA fails to rehabilitate its erroneous reallocation rule. Biofuel Intervenors further err in arguing that the statute *compels* EPA to reallocate prospective future exemptions. Biofuel Br. 14. But this Court has described whether and how to reallocate small refinery exemptions as merely a "policy," not a statutory imperative. *AFPM v. EPA*, 937 F.3d 559, 558-89 (D.C. Cir. 2019). Either way, EPA's change in policy is contrary to the statute, unreasoned, and unreasonable.

A.    Contrary to EPA's quizzical response (EPA Br. 64), Refiners do not argue that EPA has never before reallocated volumes.[8] Refiners expressly acknowledge EPA's prior formula. Refiners Br. 7.[9] But whether the statute allows EPA to prospectively project future exemptions and ratchet up obligations correspondingly (it does not) is a distinct question. Refiners Br. 24-28 (explaining,

---

[7]    Only AFPM, Sinclair, and Wynnewood present this argument. The Small Refineries Coalition (No. 22-1228) and The San Antonio Refinery LLC (No. 22-1229) take no position on the arguments made therein.

[8]    Refiners likewise search in vain for any reference to a request for a "back-door reduction" to their obligations. EPA Br. 66-67. Refiners have simply advocated that EPA *not change* its formula. To the extent EPA now interprets its prior formula to provide such a reduction, that is of EPA's own making.

[9]    While Refiners acknowledge the prior formula, it is far from clear that it correctly interprets the statute. And "in administrative law, as elsewhere, two wrongs do not make a right." *Am. Fed'n of Gov't Emps. v. FLRA*, 25 F.4th 1, 8 (D.C. Cir. 2022) (cleaned up) ("*AFGE*"). Any challenge to that prior formula is time-barred, §7607(b)(1), but if EPA lacks authority, it is no answer to say that the Agency has been asserting that authority for years.

*inter alia*, how Congress's specificity in other RFS provisions precludes implying additional authority into the statutory scheme). EPA provides no response grounding its action in the statutory text beyond its myopic, incessant resort to a purported duty to "ensure" that volumes are met. EPA Br. 63-68. But that general principle does not overcome Congress's specific instruction to EPA vis-à-vis accounting for small refinery exemptions. *See Verizon v. FCC*, 740 F.3d 623, 637 (D.C. Cir. 2014) ("a specific provision controls one of more general application" (cleaned up)). Moreover, as EPA concedes when convenient, the task Congress assigned to EPA was to promulgate percentage standards, which are imprecise vehicles to "ensure" applicable volumes. JA__[RTC_139].

EPA pivots to claiming that silence is emboldening, EPA Br. 67, but to the contrary, where Congress spoke so expressly on so many fronts in the RFS statute, *see* Refiners Br. 24-27, "statutory silence, when viewed in context, is best interpreted as limiting agency discretion." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009). EPA's attempt to preemptively distinguish *Maine Lobstermen's Association v. National Marine Fisheries Service*, EPA Br. at 67-68 n.10, fails because that case is directly on point. There, as here, "no deference to the [agency's] view of the Congress's allegedly eloquent 'silence' is appropriate because the agency has oscillated between one view and its opposite." 70 F.4th 582, 598 (D.C. Cir. 2023); *see also* Refiners Br. 28-29. In January 2019, EPA told this Court that predicting

future exemptions would be "nigh impossible," requiring EPA to "codify speculation and prejudgment." JA__[EPA_*AFPM*_Br._75]. Guessing wrong, EPA cautioned, could result in "unachievable" percentage standards. JA__[*Id*.]. Under this Court's reasoning, EPA's 180-degree turnabout deserves no deference.[10]

B.    EPA errs in claiming Refiners' argument that EPA's reallocation decision contravenes the Act's prohibition on redundant obligations was not raised with sufficient specificity. EPA Br. 69. Refiners expressly made the argument, and incorporated by reference prior comments setting forth the argument in more detail. JA__ & __[AFPM_Comment_3_n.7]. Moreover, "P[etitioners] need not raise an argument 'during the rulemaking itself, so long as the agency actually considered the issue.'" *Bates Cnty. Mem'l Hosp. v. Azar*, 464 F. Supp. 3d 43, 49 (D.D.C. 2020) (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1084 (D.C. Cir. 1996)). Indeed, this Court rejected EPA's contention that an RFS argument was inadequately preserved when "EPA's own actions"—including the purportedly insufficient argument in the rulemaking document—indicated EPA understood what the argument was. *AFPM*, 937 F.3d at 596-97. Here, EPA plainly considered the argument, as it responded both in the original 2020 rulemaking response to

_____

[10]    While in the preamble EPA claims *Chevron* deference as to its reallocation policy, JA__[87_Fed._Reg._39632], EPA did not invoke *Chevron* before this Court, precluding the Court from applying it. *Neustar, Inc. v. FCC*, 857 F.3d 886, 893-94 (D.C. Cir. 2017).

comments and in the current one. JA__-__[RTC_142-43]; JA__-__[2020_RTC_181-82] (EPA-HQ-OAR-2021-0324-0599). And Refiners further made their position known to EPA in the now-stayed 2020 RFS litigation. Initial Br. of AFPM *et al*. at 13-33, *RFS Power Coalition v. EPA*, No. 20-1046 (consolidated) (D.C. Cir. Jan. 29, 2021), Doc. 1882897.

Nor do Refiners advance an interpretation of the statute that would contradict the redundancy prohibition, *contra* EPA Br. 70. The redundancy prohibition constrains *EPA's actions*, requiring that EPA to promulgate percentage standards that would not impose redundant obligations. While, to be sure, imprecision is inherent in the statute, EPA's affirmative decision to compound that imprecision with speculation regarding future exemptions guarantees that EPA cannot "ensure" against redundancy, and is therefore arbitrary and capricious. Refiners Br. 26-27.

C.     Whatever EPA's prior interpretation, EPA's policy reversal is "unreasoned," therefore the Court "need not … reach the statutory claim." *AFGE*, 25 F.4th at 4. Even if the statute authorized EPA to consider prospective reallocation (it does not), EPA unlawfully exercised that authority here. Refiners Br. 28-32.

EPA's attempted justification of its reversal of its prior longstanding position misses the mark. EPA in the strongest of terms refused to prospectively reallocate. *Supra* §II.A; Refiners Br. 28. Nothing in EPA's brief or the rule preamble, EPA Br. 70 (referencing JA__-__[87_Fed._Reg._39632-33]), sufficiently explains how the

formerly "nigh impossible" is now possible, nor why EPA now finds "prejudgment and speculation" unproblematic. In this vein, EPA's attempt to contrast projected individual exemptions with projected "aggregate exempted volumes" and assert that the predictive quandaries plaguing the former do not afflict the latter falls flat. EPA Br. 72. EPA presents a distinction without a difference. Aside from blatant prejudgment of the outcome (which, ironically, is what EPA has done here), EPA provides no explanation for how it can possibly estimate a total exempted volume without evaluating how many small refineries might be seeking exemptions, and in what amounts.

Because EPA's reallocation decision defies the statutory text and is an unreasonable interpretation and application of EPA's purported authority, the Court should reject it.

## III. EPA's Supplemental Standard Is Unlawful.

EPA has failed to ground its supplemental standard in the statutory provisions animating either the 2016 rulemaking or the 2022 rulemaking, and has failed to justify it as a reasonable decision in its own right.

A. EPA was under no "mandate" from this Court to re-impose 250 million gallons of renewable fuel requirements from 2016 on obligated parties in 2022. Both EPA and Biofuel Intervenors err in arguing the contrary. In truth, this Court held that EPA inappropriately invoked the inadequate domestic supply waiver; the Court

did not opine on other authorities EPA may have invoked to reach a similar standard, or the ultimate question whether those additional 500 million gallons were reasonably achievable. *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 713 (D.C. Cir. 2017) ("*ACE*"). If this Court had viewed a particular course of action as necessary, it could have vacated and remanded with instructions for EPA to take that action. The Court did not; EPA cannot hide behind the Court's ruling in *ACE* as compelling its action.

As with the ill-fated reallocation formula, EPA's supplemental standard relies solely on EPA's purported duty "to ensure that the statutorily established 2016 volumes are met absent a lawful waiver." EPA Br. 77. But again, EPA acknowledges that what it promulgates is a *percentage standard*, and it is only that *percentage standard* that EPA has the ability to enforce, whether or not estimated volumes— waived or otherwise—have been "met." Moreover, EPA has steadfastly abjured any duty to do exactly what it is doing here. Refiners Br. 33-34. This does *not* mean that this Court's decision in *ACE* was an advisory opinion. Transposing requirements from 2016 to 2022 was not the only remedial option available to EPA—that EPA has failed to identify statutory authority enabling that single course of action emphatically does *not* mean that this Court's decision had no effect. Even if the only feasible course of action on remand was not to invoke the inadequate domestic

supply waiver in the future, and to interpret the provision in another way, that is a remedy.

B.    EPA responded only in the most cursory manner to Refiners' arguments that EPA had other options at its disposal. EPA Br. 76-77. Refiners' arguments (at 38-41) stand. And Biofuel Intervenors wrongly assert EPA lacked authority to utilize its cellulosic biofuel waiver to address the remaining volumes due to "backfilling" of the cellulosic shortfall with advanced biofuel. Biofuel Br. 19. As EPA explained in the preamble to the 2014-2016 RFS rule, there was "[i]nsufficient supply of other advanced biofuel to offset the shortfall in cellulosic biofuel." 80 Fed. Reg. 77420, 77426 (Dec. 14, 2015); *see also* 84 Fed. Reg. 36762, 36788 (July 29, 2019) (explaining how 380 million gallons were available for further reductions). In any event, when a cellulosic waiver is necessary, the statute authorizes EPA to reduce advanced biofuel and total renewable fuel volumes "by the same or a lesser volume," §7545(*o*)(7)(D)(i), without regard for any projected "backfilling." EPA recognized that it had the authority to take this approach, but declined to do so claiming that it would require reopening the 2016 standards. JA__[RTC_154]. But agencies routinely reach the same result on remand using different reasoning, *see Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009), and EPA has not sufficiently explained why "reopening" would be necessary (particularly when EPA

has not reopened prior years to provide compliance relief in other circumstances). EPA thus should have more seriously considered that option.

C. Further, EPA claims not to understand what criteria Refiners believe EPA ignored in promulgating the supplemental standard. EPA Br. 80. That is the wrong question. Refiners made clear that EPA ignored *all* the statutory criteria in imposing the Supplemental Standard—the Agency simply did not include the additional 250 million gallons in its evaluation of the reset criteria, and Refiners provided examples. Refiners Br. 36-38. By ignoring an entire category of fuel in its analysis, EPA violated the statute.

D. EPA arbitrarily refused to allow use of 2015 or 2016 RINs for compliance with the supplemental standard.[11] EPA offers two reasons for refusing to allow refineries that were not exempted from 2016 compliance to use unretired 2015/2016 RINs to satisfy the supplemental standard, despite the fact that this standard deals with "undercompliance" in 2016. First, EPA argues that this is not permissible "under the existing RFS regulations," but this is beside the point. Imposing a supplemental standard was not permissible until EPA issued a rule to do so. In this rule, EPA should also have revised existing regulations to account for the 2016 "overcompliance" of refineries like Sinclair that were unable

---

[11] American Fuel & Petrochemical Manufacturers does not join this argument.

to use or sell their valid 2015/2016 RINs because of EPA's delay in granting their 2016 small refinery exemptions. Second, EPA speculates that some of the unused 2015/2016 RINs "may not be valid," but there is no reason to believe that a party would unlawfully attempt to use invalid 2015/2016 RINs now when it chose not to do so in 2016.

## CONCLUSION

EPA's 2022 Standard, reallocation rule, and "supplemental" standard are unlawful. This Court should grant Refiners' petitions for review and vacate.

September 1, 2023

*/s/ Brittany M. Pemberton*
Jeffrey R. Holmstead
Brittany M. Pemberton
BRACEWELL LLP
2001 M Street NW
Suite 900
Washington, D.C. 20036
(202) 828-5800 (telephone)
(202) 857-4812 (facsimile)

*Counsel for Petitioners Sinclair*
*Wyoming Refining Co. LLC and*
*Sinclair Casper Refining Co. LLC*

*/s/ Jonathan G. Hardin*
Jonathan G. Hardin
LeAnn Johnson
Alexandra Magill Bromer
PERKINS COIE LLP
700 Thirteenth Street, NW,
Suite 800
Washington, D.C. 20005

Respectfully submitted,

*/s/ Robert J. Meyers*
Robert J. Meyers
Elizabeth B. Dawson
Siyi Shen
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2789
rmeyers@crowell.com

Richard S. Moskowitz
Tyler J. Kubik
American Fuel &
Petrochemical Manufacturers
1800 M Street, NW
Suite 900 North
Washington, DC 20036
(202) 844-5474

*Counsel for Petitioner American Fuel &*
*Petrochemical Manufacturers*

(202) 654-6200

*Counsel for Petitioners Small Refineries Coalition and The San Antonio Refinery LLC*

*/s/ Samuel P. Hershey*
Samuel P. Hershey
Thomas E. Lauria
Andrew K. Gershenfeld
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-2699
Facsimile: (212) 354-8113
Email: sam.hershey@whitecase.com

*Counsel for Petitioner Wynnewood Refining Company, LLC*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's briefing order because this brief contains 4,522 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

 Dated: September 1, 2023           */s/ Robert J. Meyers*
                                    Robert J. Meyers

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2023, I have caused the foregoing to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Robert J. Meyers*
Robert J. Meyers