# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

SINCLAIR WYOMING REFINING COMPANY LLC, *et al.*,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REAGAN,
ADMINISTRATOR,
*Respondents*,

AMERICAN PETROLEUM INSTITUTE, *et al.*,
*Intervenors.*

On Petition for Review of Final Agency Action
of the U.S. Environmental Protection Agency

## INITIAL REPLY BRIEF OF THE BIOFUELS PETITIONERS

Matthew W. Morrison
Cynthia Cook Robertson
Shelby L. Dyl
PILLSBURY WINTHROP SHAW
    PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8007

*Counsel for Waste Management, Inc.
and WM Renewable Energy, LLC*

September 1, 2023

Ethan G. Shenkman
William C. Perdue
Samuel T. Pickerill
ARNOLD & PORTER
    KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000

*Counsel for Iogen Corp. and Iogen
D3 Biofuel Partners II LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... ii

GLOSSARY .............................................................................................. iv

INTRODUCTION ......................................................................................1

ARGUMENT .............................................................................................3

   I.   EPA Erred Under Its Waiver Authority .........................................3

       A.  "The Projected Volume Available" Includes Carryover RINs ..............3

       B.  EPA's Interpretation Is Unreasonable, Arbitrary, and Capricious.......12

   II.  EPA Erred Under its Reset Authority .........................................17

CONCLUSION .........................................................................................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fuel & Petrochem. Mfrs. v. EPA,*
   3 F.4th 373 (D.C. Cir. 2021)................................................................7

*Americans for Clean Energy v. EPA,*
   864 F.3d 691 (D.C. Cir. 2017).................................8, 9, 11, 15, 21

*ANR Storage Co. v. FERC,*
   904 F.3d 1020 (D.C. Cir. 2018)........................................................13

*Biden v. Nebraska,*
   143 S.Ct. 2355 (2023)......................................................................19

*Children's Health Def. v. FCC,*
   25 F.4th 1045 (D.C. Cir. 2022)........................................................17

*Davis v. Mich. Dep't of Treasury,*
   489 U.S. 803 (1989)........................................................................20

*Goldstein v. SEC,*
   451 F.3d 873 (D.C. Cir. 2006).........................................................12

*Growth Energy v. EPA,*
   5 F.4th 1 (D.C. Cir. 2021)..................................................................6

*Ne. Hosp. Corp. v. Sebelius,*
   657 F.3d 1 (D.C. Cir. 2011)...............................................................8

*NFIB v. Sebelius,*
   567 U.S. 519 (2012)..........................................................................8

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001)........................................................................10

**Statutes**

42 U.S.C. § 7545(*o*)(2)(B)(ii) ........................................................18

42 U.S.C. § 7545(*o*)(2)(B)(ii)(VI)................................................19

42 U.S.C. § 7545(*o*)(5)...........................................................................................5

42 U.S.C. § 7545(*o*)(7)(D)(i) ..............................................................................21

Energy Independence and Security Act of 2007, Pub. L. No. 110-140,
    121 Stat. 1492 ...................................................................................................10

## Regulations

40 C.F.R. § 80.1428(c).............................................................................................5

72 Fed. Reg. 23900 (May 1, 2007) ..........................................................................5

78 Fed. Reg. 49794 (Aug. 15, 2013).........................................................................6

## GLOSSARY

| | |
|---|---|
| *ACE* | *Americans for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017) |
| EPA | U.S. Environmental Protection Agency |
| JA | Joint Appendix |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |

**INTRODUCTION**

The Clean Air Act provides that, when the mandatory cellulosic waiver is triggered, EPA "shall reduce the applicable volume of cellulosic biofuel" in the statutory table "to the projected volume available during that calendar year." By its plain meaning, "the projected volume available during that calendar year" means *all* cellulosic biofuel obligated parties may use for compliance in that year. Importantly, the volume available for compliance in a given year is *not* limited to what was produced in that year. For 2020, for example, the volume available for compliance includes not just cellulosic biofuel produced in 2020, but also cellulosic biofuel that was produced in 2019 but not used for compliance in 2019, which therefore remains available to obligated parties for compliance in 2020.

The mechanism by which 2019-produced biofuel can satisfy 2020 compliance obligations is known as "carryover RINs." That term is simply a shorthand reference to the fact that the RINs obligated parties retire for compliance are valid in *two* calendar years—the year they are generated *or* the following year. Accordingly, when EPA calculates "the projected volume available during [2020]," for example, it must include not only the volumes reflected in vintage 2020 RINs, but also the volumes reflected in vintage 2019 RINs that were carried over to 2020. Because EPA's calculations in the final rule included only a *subset* of the projected volume

of cellulosic biofuel *actually* available for compliance—grafting a vintage limitation onto the statute where none exists—the final rule must be set aside.

EPA agrees that "the projected volume available" means the volume available to obligated parties for compliance. EPA also agrees that retiring carryover RINs is a valid compliance option. And EPA further agrees that *all* RINs—whether current- or prior-year vintage—reflect real, physical volumes of biofuel blended into U.S. transportation fuel. However, EPA argues that the biofuel reflected in carryover RINs does not count because it is not produced the same year it is used for compliance. But that does not matter—Congress expressly allowed cellulosic biofuel produced one year to be used for compliance the next year. Ultimately, EPA is left with arguments that rely not on the statutory text, structure, or purpose, but on generalized concerns about "compliance flexibility." Those concerns are misplaced—obligated parties have other sources of compliance flexibility, and a persistent cellulosic RIN bank suppresses investment in cellulosic production. But regardless, EPA's policy concerns cannot justify rewriting the statute.

EPA's arguments under its reset authority fare no better. EPA itself determined that "the appropriate volume after analyzing the various [reset] factors is the projected volume available," which "is equivalent to the resulting volume after exercise of the cellulosic waiver." Moreover, the statutory text and structure preclude EPA from using its general reset authority to override Congress's specific

implementation directions in the mandatory cellulosic waiver provision. In any event, EPA issued cellulosic waiver credits for the years in question. EPA's authority to issue those credits depends on its mandatory cellulosic waiver authority, which in turn requires EPA to reduce the required cellulosic volume to "the projected volume available"—not some other, lower volume supposedly warranted by the reset factors. More broadly, EPA's interpretation ignores the RFS program's market-forcing design. The final rule should be set aside.

## ARGUMENT

## I.    EPA Erred Under Its Waiver Authority

Under the mandatory cellulosic waiver, "the projected volume available" means what it says—*all* cellulosic biofuel available to obligated parties for compliance, not just *some*. EPA's contrary interpretation, which excludes readily available volumes reflected in carryover RINs, conflicts with the statute and is unreasonable, arbitrary, and capricious.

### A.    "The Projected Volume Available" Includes Carryover RINs

The text, structure, and purpose of the mandatory cellulosic waiver provision compel the conclusion that "the projected volume available" includes volumes reflected in carryover RINs.

Starting with the text, EPA "agrees" that "the term 'projected volume available' means 'the volume available to obligated parties for the purpose of compliance with the volume obligations under the RFS.'" Opp. 26 (quoting Br. 19).

EPA also agrees that "carryover RINs" are a valid "compliance option" that obligated parties "can … use to meet … their compliance obligations."  Opp. 9, 25. That should end the matter.  The "projected volume available" means all volumes of cellulosic biofuel available to obligated parties for compliance; volumes of cellulosic biofuel reflected in carryover RINs are available for compliance; ergo, the "projected volume available" includes volumes reflected in carryover RINs.

Rather than follow this simple syllogism, EPA construes "the projected volume available" to include only a *subset* of the volume of cellulosic biofuel actually available to obligated parties for compliance in a given year.  A simple graphic for compliance year 2020 illustrates EPA's position:



As shown, EPA's interpretation includes only *some* of "the projected volume available," not *all* of it.

EPA responds by trying to distinguish the "available volume of *fuel* in the current year" from "credits *representing fuel* from the prior year." Opp. 35. But that distinction is unavailing. The volume of cellulosic biofuel "available" for compliance in a given calendar year always corresponds to the volume of fuel-representing RINs that obligated parties may retire in that year. Obligated parties show compliance by retiring cellulosic RINs, and "cellulosic RINs correspond to actual cellulosic biofuel." Opp. 31. This is true regardless of the year the RIN was generated. Prior-year RINs that are carried over into the current year still reflect physical biofuel volumes introduced into the U.S. transportation fuel supply—just like other RINs. The only difference is the RIN's vintage.

The question here is whether the volumes that undisputedly are reflected in carryover RINs are "available" for compliance "during th[e] calendar year" in question. The answer is yes. Congress provided for parties that refine, blend, or import renewable fuel to receive tradable credits, and also provided for those credits to be valid during the year they are generated *or* the following year. *See* § 7545(*o*)(5); 40 C.F.R. § 80.1428(c); 72 Fed. Reg. 23900, 23933-34 (May 1, 2007); Br. 20. As EPA acknowledged a decade ago when including carryover RINs in related volume requirements, "carryover RINs are available" as "a valid compliance

5

mechanism," which obligated parties can "use[] to fulfill part of the [relevant] requirement." 78 Fed. Reg. 49794, 49813, 49822 (Aug. 15, 2013).

EPA's specious distinction between fuel and RINs also contradicts arguments EPA recently made to this Court. In *Growth Energy v. EPA*, 5 F.4th 1 (D.C. Cir. 2021), a petitioner "challenge[d] EPA's decision to exclude electricity generated from renewable biomass (a form of cellulosic biofuel) from its cellulosic biofuel projection." *Id.* at 14. EPA responded that renewable electricity was unlikely to "generate RINs" due to unresolved "technical and regulatory issues." *Id.* In other words, EPA argued—correctly—that the statute requires it to project the volume of *RIN-generating* cellulosic biofuel, not the volume of cellulosic biofuel itself. Here, EPA argues the opposite.

To illustrate the flaw in EPA's interpretation, consider two gallons of liquid cellulosic biofuel. One gallon is produced on January 1, 2020, generating a vintage 2020 RIN. The other gallon is produced on December 31, 2019, generating a vintage 2019 RIN, which is not retired immediately, but instead is carried over into 2020. There is no relevant difference between these two RINs. They are fungible credits. Both RINs represent the same amount of cellulosic biofuel. And both RINs are equally available to obligated parties for compliance during 2020. Accordingly, the volumes represented by both RINs must be included in "the projected volume available during [2020]." EPA's attempt to distinguish between RINs based on their

vintage simply ignores how RINs function.  Put another way, EPA effectively inserts words into the statute, transforming "the projected volume available during that calendar year" into "the projected volume *produced and* available during that calendar year."

EPA responds that the biofuels petitioners' reading "itself effectively inserts words into the statute by construing it to mean 'projected volume available *plus carryover RINs*.'"  Opp. 28-28.  That retort falls flat.  The plain meaning of "the projected volume available" already includes volumes reflected in carryover RINs because those volumes are "available" to obligated parties for compliance.

Nor does it matter that the statutory language does not "define the term 'projected volume available'" or "make any reference to RINs or credits."  Opp. 22.  EPA concedes that "Congress … contemplated the existence of cellulosic carryover RINs" and authorized obligated parties to use them for compliance.  Opp. 30.  EPA also concedes that, in the mandatory cellulosic waiver provision, "the projected volume available" means the volume of cellulosic biofuel available to obligated parties for compliance.  *See* Opp. 26.  Putting those two statutory elements together, "Congress has directly spoken to the precise question at issue," *Am. Fuel & Petrochem. Mfrs. v. EPA*, 3 F.4th 373, 380 (D.C. Cir. 2021) (quotation marks omitted)—it (1) made volumes reflected in carryover RINs available for compliance

and (2) directed EPA to include *all* volumes available for compliance in "the projected volume available."

This Court's decision in *Americans for Clean Energy v. EPA* ("*ACE*"), 864 F.3d 691 (D.C. Cir. 2017), is not to the contrary. As the biofuels petitioners explained, *ACE* interpreted the general waiver provision, not the mandatory cellulosic waiver provision. Whether there is "inadequate domestic supply" warranting a discretionary general waiver of the statutory volume requirements for all fuel types is unrelated to whether volumes of cellulosic biofuel reflected in carryover RINs are "available" to obligated parties for compliance. *See* Br. 27-28. Indeed, EPA concedes that *ACE* involved "a different statutory context." Opp. 27.

Intervenors take a different approach, arguing that "'projected volume available' is shorthand for … the 'projected volume of *cellulosic biofuel production*." Intervenors Br. 1. That reading, however, runs headlong into the principle that "[w]here Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally," *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012)—"especially" where different words "are used in the same sentence," *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 12 (D.C. Cir. 2011) (quotation marks omitted). EPA itself rejects this reading, agreeing with the biofuels petitioners that "the projected volume available" means the projected volume available to obligated parties for compliance. *See*

Opp. 26. Ultimately, the intervenors recognize that "the projected volume available" must "account for" cellulosic biofuel that "will not be available to use for compliance." Intervenors Br. 7. But if "the projected volume available" means the volume available for compliance, it must include *all* of the volume available for compliance—including volumes reflected in carryover RINs.

The statutory purpose also supports the biofuels petitioners, in two ways. First, EPA construes the mandatory cellulosic waiver broader than serves its purpose. EPA acknowledges that the cellulosic waiver is a "safety valve" that "evince[s] a clear concern for production shortfalls." Opp. 23 (quotation marks omitted). It "ease[s] the … Program's requirements when complying … would be infeasible." *ACE*, 864 F.3d at 708. But if obligated parties can satisfy their obligations by retiring carryover RINs, then compliance is not "infeasible" and there is no "production shortfall." *See* Br. 23-24. EPA has no response.

Second, EPA's interpretation contravenes the RFS program's goal of "creating demand pressure to increase consumption of renewable fuels." *ACE*, 864 F.3d at 710 (quotation marks omitted). As the biofuels petitioners explained, excluding carryover RINs from "the projected volume available" creates a persistent surplus of cellulosic RINs, driving actual and expected cellulosic RIN prices downward and suppressing investment. *See* Br. 22-23. EPA responds by invoking

the need for "compliance flexibility." Opp. 24. But "compliance flexibility" alone cannot justify EPA's interpretation.

To begin with, increasing renewable fuel production is the RFS program's primary objective, with compliance flexibility at most a secondary concern. Congress enacted this program "to move the United States toward greater energy independence and security[ and] to increase the production of clean renewable fuels," not to facilitate compliance flexibility. Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492.

Furthermore, Congress considered this "compliance flexibility" problem and addressed it through cellulosic waiver credits. As the biofuels petitioners explained, when the mandatory cellulosic waiver is triggered, EPA must issue cellulosic waiver credits, which satisfy obligated parties' cellulosic volume obligations. *See* Br. 7, 27-28. In other words, Congress *already* addressed this very problem in *separate, neighboring provisions of the statute*. It does not make sense that Congress would address this problem twice—once in detailed, explicit language, and then again through the terse words "the projected volume available." "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

EPA does not dispute that cellulosic waiver credits already address the same "compliance flexibility" problem as EPA's interpretation of "the projected volume available." *See* Br. 27-28. Instead, EPA argues that, "despite the availability of cellulosic waiver credits, Congress nevertheless contemplated the existence of cellulosic carryover RINs." Opp. 30. That is irrelevant. The biofuels petitioners' interpretation would not abolish carryover cellulosic RINs or prevent a cellulosic RIN bank from emerging. The *only* change would be that, in setting the applicable volume under its mandatory cellulosic waiver authority, EPA could not *intentionally preserve* an existing cellulosic RIN bank.

EPA also suggests that the compliance flexibility afforded by cellulosic waiver credits is insufficient, and that including carryover RINs in "the projected volume available" may not actually increase cellulosic demand. *See* Opp. 30-37. As explained below, those arguments are wrong. *See infra,* § I.B. More fundamentally, they conflict with congressional policy choices. Congress considered this compliance flexibility problem, and it provided a solution. It is not EPA's role to reject that solution as inadequate and enact a new one. And Congress built the entire RFS program on the premise that "increasing requirements" will "force the market to create ways to produce and use greater and greater volumes of renewable fuel each year." *ACE*, 864 F.3d at 710. There is no basis to conclude that Congress thought higher volume requirements would have a different effect in this context.

## B.     EPA's Interpretation Is Unreasonable, Arbitrary, and Capricious

In any event, EPA's interpretation is unreasonable, arbitrary, and capricious. EPA's explanation for excluding carryover RINs from "the projected volume available" is inadequate in multiple ways.

*First*, EPA cannot overcome that its interpretation is a poor "'fit' with the statutory language" and "statutory purposes." *Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006) (quotation marks omitted).  While EPA's brief asserts that its interpretation is "the best reading of the statute" and that the biofuels petitioners' interpretation is "[s]trained," Opp. 17, 21, 25, 26, EPA in the rulemaking process repeatedly acknowledged that the biofuels petitioners' interpretation is "reasonable," JATK[RTC.45, 86.FR.72456], without ever saying which reading is "best" as an interpretive matter.  Furthermore, EPA's brief does not contend that the term "the projected volume available" itself exhibits any congressional intent to exclude carryover RINs.  Rather, EPA relies on purported statutory silence and concerns about compliance flexibility.  EPA's reading thus is grounded not in the text, structure, and purpose of the mandatory cellulosic waiver or the RFS program's main goals, but in a generalized desire to the make the RFS program easier for obligated parties to comply with and for EPA to administer.  Those general preferences are not a valid basis for rejecting the biofuels petitioners' concededly

reasonable alternative approach, which is faithful to the statutory text, structure, and purpose.

*Second*, EPA's treatment of carryover RINs and net imports is "internally inconsistent." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018). As the biofuels petitioners explained, the final rule calculates "the projected volume available" as domestic production plus imports minus exports, reasoning domestic production and imports (which generate RINs) are "available" to obligated parties for compliance, whereas exports (which do not generate RINs) are not. *See* JATK[RTC.45]. But if net imports are available for compliance because they will be reflected in RINs, so too are the volumes reflected in carryover RINs. *See* Br. 30-32. EPA responds that it "reasonably interpreted the statute to refer to available volume of *fuel* in the current year, as opposed to credits *representing fuel* from the prior year." Opp. 35. But that explanation does not make sense. Again, carryover RINs represent physical biofuel volumes introduced into the U.S. transportation fuel supply, and those volumes are "available" for compliance in the current calendar year. EPA never explains why it matters that the physical fuel reflected in carryover RINs was produced or imported in the prior year.

*Third*, EPA argues that the compliance flexibility afforded by cellulosic waiver credits is insufficient, but its reasons do not withstand scrutiny. To begin with, EPA asserts that "a cellulosic waiver credit has no physical analogue …, but

merely represents money paid to the U.S. Treasury." Opp. 30-31. Even if that assertion were true, cellulosic waiver credits still enable obligated parties to meet their cellulosic volume obligations. And EPA's assertion is *not* true. As EPA emphasizes, "a cellulosic waiver credit satisfies only the cellulosic biofuel obligation, whereas retirement of a cellulosic RIN simultaneously satisfies an obligated party's advanced biofuel and total renewable fuel obligations." Opp. 31. In other words, a cellulosic waiver credit functions as a fee obligated parties can pay to retire an advanced RIN instead of a cellulosic RIN. To facilitate full compliance, therefore, cellulosic waiver credits come with a "physical analogue"—they reflect introducing non-cellulosic advanced biofuel (*i.e.*, biomass-based diesel or sugarcane ethanol) into transportation fuel instead of cellulosic biofuel.

EPA also claims that cellulosic waiver credits are inadequate because they require obligated parties to retire advanced RINs in place of cellulosic RINs. *See* Opp. 31. But EPA does not dispute that advanced RINs are relatively abundant and that the market treats advanced biofuel "as the marginal RFS compliance option." JATK[RIA.43]; *see* Br. 32. Instead, EPA asserts that use of cellulosic waiver credits and advanced RINs in place of cellulosic RINs may deplete the advanced RIN bank, which EPA projects to be smaller than it once was. Opp. 31. But that is an unreasonably contingent basis for refusing to include carryover RINs in "the

projected volume available." If at some point EPA determines that the advanced RIN bank is too small, it can address that problem then.

EPA also asserts that cellulosic waiver credits are inadequate because they "are less likely to be available from 2023 onward." Opp. 31. As the biofuels petitioners explained, however, if cellulosic waiver credits are not available in a given year, that *necessarily* means that obligated parties do not need the compliance flexibility those credits provide. *See* Br. 28-29, 32-33. EPA has no response. EPA also ignores that obligated parties also can use carryover deficits as yet another source of compliance flexibility. *See* Br. 6-7, 29, 32-33.

*Fourth*, EPA contends that including carryover RINs in "the projected volume available" would "increase the likelihood that EPA would need to consider requests for retroactive waivers of established standards when unforeseen circumstances result in less supply than EPA anticipated." Opp. 34. But EPA's own language shows that retroactive waivers are speculative, arising only in "unforeseen circumstances." So long as EPA administers the program competently, it generally can issue future waivers prospectively, avoiding this problem. On the other hand, excluding volumes reflected in carryover RINs from "the projected volume available" guarantees a harmful persistent oversupply of cellulosic RINs *right now*.

*Finally*, EPA improperly dismissed the RFS program's goal as a "market forcing policy." *ACE*, 864 F.3d at 710 (citation omitted). EPA's brief doubles down

on that error, questioning whether the biofuels petitioners' approach would increase cellulosic demand, and even suggesting that it may *decrease* it. But EPA's arguments crumble on inspection. For example, EPA notes that cellulosic production has grown over the past ten years. *See* Opp. 24-25. But EPA ignores that cellulosic production has grown far slower than Congress envisioned—a deficiency the biofuels petitioners' interpretation would help ameliorate. *See* Br. 8, 22, 31-34, 41. EPA also asserts that including carryover RINs in "the projected volume available" "could actually *decrease* demand for cellulosic biofuel." Opp. 34. But EPA's record citations do not support the counterintuitive notion that requiring obligated parties to retire *more* cellulosic RINs will somehow lead them to buy *fewer* of them.

Strangest of all is EPA's suggestion that "[t]he statutory scheme does not turn on RIN prices at all." Opp. 37 n.6. EPA's own Regulatory Impact Analysis indicates that RIN prices reflect the extent to which "RFS requirements" are "the driving force behind" increases in the use of renewable fuels, as opposed to other factors. *See* JATK[RIA.42]. And as petitioner Iogen Corp.'s comments explained, there is "a direct and unsurprising correlation" between cellulosic RIN prices and cellulosic production capacity. JATK[Iogen.comment.15]. That is why, in the final rule, EPA was compelled to acknowledge that "the potential for lower cellulosic RIN prices could have a directionally negative impact on cellulosic biofuel

investment." JATK[87.FR.39616]. Increasing investment and production, of course, is the RFS program's central goal.

## II. EPA Erred Under its Reset Authority

EPA cannot salvage the final rule by invoking its reset authority. Like its interpretation of the mandatory cellulosic waiver, EPA's interpretation of the reset is inconsistent with the statute, unreasonable, arbitrary, and capricious.

At the outset, EPA asserts that the biofuels petitioners "forfeited" any argument about the reset by failing to raise it in their comments. Opp. 41. That assertion cannot be squared with Iogen's comments, which expressly argued that "EPA must include carryover cellulosic RINs in its projections of the volumes available for compliance, both under EPA's cellulosic waiver authority and under its reset authority." JATK[Iogen.comments.33]. Iogen's comments contain an entire section on the treatment of carryover cellulosic RINs under the reset. *See id.* That was more than sufficient to give EPA "a fair opportunity to pass on [the] legal … argument"—as it in fact did. *Children's Health Def. v. FCC*, 25 F.4th 1045, 1050 (D.C. Cir. 2022) (quotation marks omitted).

On the merits, while EPA asserts that the reset is "separate and independent" of the mandatory cellulosic waiver, Opp. 1, 18, EPA fails to grapple with its *own* determination that these two authorities align. In EPA's words, the appropriate cellulosic volumes "after analyzing the various [reset] factors" and "after exercise

of the cellulosic waiver" are "equivalent." JATK[87.FR.39608]. EPA did not even offer a "separate analysis" under these two provisions; one analysis "subsume[d]" the other. *Id.* Because EPA's exercise of its cellulosic waiver authority was erroneous, its exercise of its reset authority was erroneous as well.

EPA notes that "the reset provision does not include" the term "the projected volume available" and asserts that "EPA's analysis under the reset authority did not involve interpretation of that term." Opp. 44. But that assertion is wrong. The final rule determined that "the appropriate volume after analyzing the various [reset] factors is *the projected volume available*." JATK[87.FR.39608] (emphasis added). EPA also states that it analyzed the projected volume available "only once" merely "to avoid duplication," Opp. 44, but that just proves the biofuels petitioners' point: EPA's analysis under both authorities *is the same*. If that analysis is mistaken—and it is, *see supra*, Part I—the final rule must be set aside.

EPA also relies on statutory language allowing EPA to reset the applicable volumes "based on a review of the implementation of the program." § 7545(*o*)(2)(B)(ii); *see* Opp. 43. But here, EPA's implementation review was *wrong*; it incorrectly assumed that Congress authorized EPA to exclude volumes reflected in carryover RINs from "the projected volume available." Indeed, in the section of the final rule analyzing the "implementation of the program" reset factor, EPA expressly discussed its (erroneous) interpretation of "the projected volume

available." *See* JATK[87.FR.39610] (explaining that Section III.B of the final rule is part of EPA's "review of the implementation of the program"); JATK[87.FR.39615-16] (discussing EPA's interpretation of "the projected volume available" within Section III.B).

Nor can EPA justify excluding volumes reflected in carryover RINs under other reset factors. As the biofuels petitioners explained, the final rule discusses carryover RINs *only* under the "implementation of the program" factor. *See* Br. 38. EPA now suggests that it also considered carryover RINs in connection with "the impact of the use of renewable fuels on other factors," § 7545(*o*)(2)(B)(ii)(VI), but its record citations do not support that notion. Regardless, that reset factor still cannot justify ignoring Congress's specific directive in the mandatory cellulosic waiver provision that "the projected volume available" must include *all* volumes available—including those reflected in carryover RINs.

By authorizing EPA to "modif[y]" the applicable volumes in a reset, Congress did not invite EPA to radically alter the RFS program's basic design. As the Supreme Court recently explained, "statutory permission to 'modify' does not authorize basic and fundamental changes in the scheme designed by Congress." *Biden v. Nebraska*, 143 S.Ct. 2355, 2368 (2023) (quotation marks omitted). "Instead," it "must be read to mean 'to change moderately or in minor fashion.'" *Id.*

Overriding Congress's determination that "the projected volume available" includes volumes reflected in carryover RINs is not a "moderate[]" or "minor" change.

EPA's dismissal of the statutory structure fares no better. EPA does not dispute that the reset functions as a multi-year prospective waiver, allowing EPA to modify future volume requirements when further waivers are very likely. *See* Br. 37; Opp. 41. Instead, EPA argues that "the statutory requirements triggering the exercise of the reset authority *have no bearing* on how EPA must *apply* the reset once that trigger is met." Opp. 41-42 (first emphasis added). That invitation to ignore the reset's statutory function is striking. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Moreover, EPA is wrong to suggest that, under the biofuels petitioners' reading, the reset provision "limits EPA to only tak[e] action that it would have been authorized to take before the reset was triggered." Opp. 43. EPA is free to respond to the conditions that triggered the reset based on the reset factors. But EPA cannot use its general reset authority to countermand Congress's specific directions elsewhere in the statute about how to implement the program.

Regardless, EPA fails to explain how it can justify the required cellulosic volumes solely under its reset authority when EPA issued cellulosic waiver credits during the years in question. As EPA acknowledges, it may issue cellulosic waiver

credits "only … when EPA applies its cellulosic waiver authority." Opp. 32. But if EPA "applies its cellulosic waiver authority," it *must* reduce the required cellulosic volume to "the projected volume available," § 7545(*o*)(7)(D)(i)—not some other, lower volume supposedly warranted by the reset factors. EPA's issuance of cellulosic waiver credits alone precludes EPA from relying on the reset alone as a sufficient basis for the final rule separate from the mandatory cellulosic waiver.

Finally, EPA's reset analysis again improperly discounts the RFS program's fundamental purpose as a "market forcing policy." *ACE*, 864 F.3d at 710 (quotation marks omitted). Cellulosic biofuel is where the program has fallen farthest short of Congress's goals. But instead of taking concededly reasonable steps to bring production closer to the trajectory Congress envisioned, EPA did the opposite. That is contrary to the statute, unreasonable, arbitrary, and capricious.

## CONCLUSION

The Court should grant the petitions, set aside the final rule, and remand for further proceedings consistent with the arguments above.

Dated:  September 1, 2023

Respectfully submitted,

/s/ Ethan G. Shenkman

Matthew W. Morrison
Cynthia Cook Robertson
Shelby L. Dyl
PILLSBURY WINTHROP SHAW
   PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8007

*Counsel for Waste Management, Inc.*
*and WM Renewable Energy, LLC*

Ethan G. Shenkman
William C. Perdue
Samuel T. Pickerill
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000

*Counsel for Iogen Corp. and*
*Iogen D3 Biofuel Partners II LLC*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of this Court's order of February 1, 2023, because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 4,548 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ Ethan G. Shenkman
Ethan G. Shenkman

September 1, 2023

## CERTIFICATE OF SERVICE

I certify that on September 1, 2023, I caused a copy of this brief to be filed with the Clerk of the Court using the Court's case management/electronic case filing system, which will automatically serve notice of the filing on registered users of that system.

/s/ Ethan G. Shenkman
Ethan G. Shenkman

September 1, 2023