**ORAL ARGUMENT SCHEDULED FOR NOVEMBER 3, 2023**
**No. 22-1210 (and consolidated cases)**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――

SINCLAIR WYOMING REFINING COMPANY LLC, *et al.*,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REAGAN,
ADMINISTRATOR,
*Respondents*,

―――――――――

AMERICAN PETROLEUM INSTITUTE, *et al.*,
*Intervenors.*

―――――――――

On Petition for Review of Final Agency Action
of the U.S. Environmental Protection Agency

―――――――――

## FINAL BRIEF OF THE BIOFUELS PETITIONERS

―――――――――

Matthew W. Morrison
Cynthia Cook Robertson
Shelby L. Dyl
PILLSBURY WINTHROP SHAW
  PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8007

*Counsel for Waste Management, Inc.
and WM Renewable Energy, LLC*

Ethan G. Shenkman
Jonathan S. Martel
William C. Perdue
Jillian M. Williams
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000

*Counsel for Iogen Corp. and Iogen
D3 Biofuel Partners II LLC*

September 19, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a), petitioners Iogen Corporation, Iogen D3 Biofuel Partners II LLC, Waste Management, Inc., and WM Renewable Energy, LLC, through undersigned counsel, hereby certify the following as to parties, rulings, and related proceedings in this case:

*Parties, Intervenors, and Amici*

**A.    Petitioners**

Sinclair Wyoming Refining Company LLC and Sinclair Casper Refining Company LLC (No. 22-1210); Iogen Corporation and Iogen D3 Biofuel Partners II LLC (collectively, "Iogen") (No. 22-1225); American Fuel & Petrochemical Manufacturers (No. 22-1227); American Refining Group, Inc., Calumet Montana Refining, LLC, Calumet Shreveport Refining, LLC, Ergon Refining, Inc., Ergonwest Virginia, Inc., Hunt Refining Company, Par Hawaii Refining, LLC, Placid Refining Company LLC, San Joaquin Refining Co., Inc., U.S. Oil & Refining Company, and Wyoming Refining Company (No. 22-1228); The San Antonio Refinery LLC (No. 22-1229); Waste Management, Inc. and WM Renewable Energy, LLC (collectively, "Waste Management") (No. 22-1230); and Wynnewood Refining Co. LLC (No. 22-1331).

**B.    Respondents**

U.S. Environmental Protection Agency and Michael S. Regan, Administrator.

**C.    Intervenors**

American Petroleum Institute; American Fuel & Petrochemicals Manufacturers; Renewable Fuels Association; Clean Fuels Alliance America; Growth Energy.

**D.    Amici**

None.

### *Rulings Under Review*

*Renewable Fuel Standard Program: Renewable Fuel Standard Annual Rules*, 87 Fed. Reg. 39,600 (July 1, 2022).

### *Related Cases*

The agency action challenged in these consolidated cases has not been before this Court or any other court.

The same or similar issues to those presented in this brief have been presented in the following pending consolidated cases: *RFS Power Coalition v. U.S. Environmental Protection Agency*, No. 20-1046 and consolidated cases (D.C. Cir.).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners Iogen and Waste Management provide the following corporate disclosure statement:

**Iogen Corporation and Iogen D3 Biofuel Partners II LLC** are private companies engaged in the business of producing, distributing, and selling cellulosic biofuels and generating and selling renewable identification numbers ("RINs"). Iogen D3 Biofuel Partners II LLC is owned by Iogen Biofuel Holdings II LLC, which is owned by Iogen Biofuel Holdings II Corporation, which is owned by Salem Holdco Corporation, which is owned by Iogen Corporation, which is owned by Iogen Holdings Corporation. No publicly owned corporation owns 10% or more of the outstanding equity interests in any of the companies listed in this paragraph.

**Waste Management, Inc.**, a Delaware corporation, is a leading provider of integrated waste management and environmental solutions services in North America, including the production of compressed and liquefied renewable natural gas from landfill biogas and the generation of cellulosic renewable identification numbers. Waste Management, Inc. is a holding company, and all operations are conducted by its wholly-owned and majority-owned subsidiaries. Waste Management, Inc. has no parent corporation, and no publicly held company has 10% or greater ownership in Waste Management, Inc.

**WM Renewable Energy, LLC**, a Delaware corporation, develops, operates, and promotes projects for the beneficial use of landfill gas as an alternative to the use of fossil fuels for the generation of energy. WM Renewable Energy, LLC's projects generate cellulosic renewable identification numbers or "D3 RINs." WM Renewable Energy, LLC is a wholly-owned subsidiary of WM Partnership Holdings, Inc. WM Partnership Holdings, Inc. is a wholly-owned subsidiary of Waste Management Holdings, Inc., which is a wholly-owned subsidiary of Petitioner Waste Management, Inc. Other than WM Partnership Holdings, Inc., no publicly held company holds a 10% or greater interest in WM Renewable Energy, LLC.

## TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF AUTHORITIES ................................................ vii

GLOSSARY ............................................................. xi

INTRODUCTION ......................................................... 1

JURISDICTION ......................................................... 3

STATEMENT OF ISSUES ................................................. 4

STATUTE .............................................................. 4

    A.  The Renewable Fuel Standard Program ............................... 4

    B.  EPA's Waiver Authorities ........................................ 7

    C.  EPA's Reset Authority .......................................... 9

    D.  The 2020 Final Rule ........................................... 10

    E.  The 2022 Final Rule ........................................... 12

SUMMARY OF ARGUMENT ............................................... 14

ARGUMENT ............................................................ 18

I.    EPA Erred in Failing To Include Carryover Cellulosic RINs in "the Projected Volume Available" Under Its Cellulosic Waiver Authority ....... 18

    A.  "The Projected Volume Available" Unambiguously Includes Carryover Cellulosic RINs ........................................... 19

    B.  EPA's Reading of "the Projected Volume Available" Is Unreasonable .......................................................... 29

    C.  EPA's Reading of "the Projected Volume Available" Is Arbitrary and Capricious ........................................................ 31

II.   EPA Erred in Failing To Include Carryover Cellulosic RINs in the Modified Applicable Volumes Under its Reset Authority ................... 34

    A.  The Modified Applicable Volume Under a Reset Unambiguously Must Include Carryover Cellulosic RINs ................................. 36

    B.  EPA's Use of its Reset Authority To Exclude Carryover Cellulosic RINs Is Unreasonable, Arbitrary, and Capricious ...................... 38

CONCLUSION .......................................................... 41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Alon Ref. Krotz Springs, Inc. v. EPA*,
    936 F.3d 628 (D.C. Cir. 2019) .......................................................6, 17

*Am. Fuel & Petrochem. Mfrs. v. EPA*,
    3 F.4th 373 (D.C. Cir. 2021) .......................................................19, 38

*Am. Fuel & Petrochem. Mfrs. v. EPA*,
    937 F.3d 559 (D.C. Cir. 2019) ...........................................4, 17, 18, 21

*Am. Petrol. Inst. v. EPA*,
    706 F.3d 474 (D.C. Cir. 2013) .......................................................7, 23

*Americans for Clean Energy v. EPA* ("*ACE*"),
    864 F.3d 691 (D.C. Cir. 2017) ................. 4, 5, 6, 7, 20, 22, 23, 25, 27, 31, 33, 40

*ANR Storage Co. v. FERC*,
    904 F.3d 1020 (D.C. Cir. 2018) .......................................................31

*English v. Trump*,
    279 F. Supp. 3d 307 (D.D.C. 2018) ...............................................19

*Fund For Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003) .......................................................17

*Goldstein v. SEC*,
    451 F.3d 873 (D.C. Cir. 2006) .................................................29, 30, 31

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*,
    141 S. Ct. 2172 (2021) .................................................................5, 6, 7

*Michigan v. EPA*,
    576 U.S. 743 (2015) .......................................................................30

*Monroe Energy LLC v. EPA*,
    750 F.3d 909 (D.C. Cir. 2014) .......................................................21

*N.E. Hosp. Corp. v. Sebelius*,
    657 F.3d 1 (D.C. Cir. 2011) ...........................................................21

## Cases—Continued

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
   26 F.4th 960 (D.C. Cir. 2022)............................................................25

*Nat'l Biodiesel Bd. v. EPA*,
   843 F.3d 1010 (D.C. Cir. 2016).........................................................17

*Nat'l Petrochem. & Refs. Ass'n v. EPA*,
   630 F.3d 145 (D.C. Cir. 2010).............................................................7

*NFIB v. Sebelius*,
   567 U.S. 519 (2012)...........................................................................21

*P & V Enters. v. U.S. Army Corps of Eng'rs*,
   516 F.3d 1021 (D.C. Cir. 2008).........................................................26

*Ross v. Blake*,
   578 U.S. 632 (2016)...........................................................................19

*Util. Air Reg. Grp. v. EPA*,
   573 U.S. 302 (2014)...........................................................................39

## Statutes

42 U.S.C.
   § 7545(*o*)(1)(F) ..................................................................................5
   § 7545(*o*)(2)(B) .............................................................................5, 21
   § 7545(*o*)(2)(B)(i)(I) ..........................................................................5
   § 7545(*o*)(2)(B)(i)(II) .........................................................................5
   § 7545(*o*)(2)(B)(i)(III) ........................................................................5
   § 7545(*o*)(2)(B)(i)(IV) ........................................................................5
   § 7545(*o*)(2)(B)(ii) .............................................................10, 34, 37
   § 7545(*o*)(2)(D)(ii) .............................................................14, 37, 40
   § 7545(*o*)(2)(D)(ii)(III) .....................................................................38
   § 7545(*o*)(3)(B) ..................................................................................6
   § 7545(*o*)(3)(B)(i) ...............................................................................5
   § 7545(*o*)(5)(C) ......................................................................6, 20, 24
   § 7545(*o*)(5)(D) ......................................................................7, 29, 32
   § 7545(*o*)(7)(A) .............................................................................7, 9

§ 7545(*o*)(7)(B) ...................................................................7
§ 7545(*o*)(7)(C) ...................................................................7
§ 7545(*o*)(7)(D) ...................................................................7
§ 7545(*o*)(7)(D)(i) ...................................... 1, 4, 7, 14, 18, 19, 21, 30, 40
§ 7545(*o*)(7)(D)(ii) ........................................................8, 27, 40
§ 7545(*o*)(7)(D)(iii) ...........................................................27
§ 7545(*o*)(7)(E) ...................................................................7
§ 7545(*o*)(7)(F) .................................................4, 9, 34, 36, 37, 40

## Regulations

40 C.F.R.

§ 80.1456...............................................................27
§ 80.1456(a) ...........................................................40
§ 80.1456(b) ............................................................8
§ 80.1428(c) .........................................................6, 20

78 Fed. Reg. 49794 (Aug. 15, 2013) ....................................26

80 Fed. Reg. 77420 (Dec. 14, 2015) .....................................20

81 Fed. Reg. 89746 (Dec. 12, 2016) .....................................10

82 Fed. Reg. 58486 (Dec. 12, 2017) .....................................10

83 Fed. Reg. 63704 (Dec. 11, 2018) .....................................10

85 Fed. Reg. 7016 (Feb. 6, 2020) ................................10, 11, 30

87 Fed. Reg. 80582 (Dec. 30, 2022) ................................14, 28

## Other Authorities

*Carryover RIN Bank Calculations for 2020 Final Rule*,
   EPA-HQ-OAR-2019-0136-2052 (Dec. 3, 2019)..............................11

*Cellulosic Waiver Credits Under the Renewable Fuel Standard
   Program*, EPA, https://bit.ly/3mZR9Td ................................12

*Renewable Fuel Standard Program – Standards for 2020 and Biomass-Based Diesel for 2021 and Other Changes: Response to Comments*, EPA-420-R-19-018 (Dec. 2019)......................................................11

*Renewable Fuel Standards for 2014, 2015 and 2016 and the Biomass-Based Volume for 2017: Response to Comments*, EPA-420-R-15-024 (Nov. 2015)..................................................................................10

# GLOSSARY

| | |
|---|---|
| *ACE* | *Americans for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017) |
| EPA | U.S. Environmental Protection Agency |
| JA | Joint Appendix |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |

## INTRODUCTION

The Renewable Fuel Standard ("RFS") program under the Clean Air Act mandates that certain amounts of renewable fuel, including cellulosic biofuel, must be introduced into the U.S. transportation fuel supply each year.  Refiners and importers comply with this mandate through use of tradable credits known as Renewable Identification Numbers ("RINs"), which represent the blending of certain quantities of renewable fuel into the fuel supply.  RINs can be used for compliance in the same year in which they are generated, or they can be held for use in the following year as so-called "carryover" RINs.

If the projected volume of cellulosic biofuel production for a given year is less than the statutorily required volume, Congress directed the U.S. Environmental Protection Agency ("EPA") to waive or "reduce" the required cellulosic volume "to the projected volume available during that calendar year."  42 U.S.C. § 7545(*o*)(7)(D)(i).[1]  In the final rule at issue, EPA exercised this cellulosic waiver authority to reduce the required cellulosic volumes for 2020, 2021, and 2022, but it miscalculated the revised volumes.  In particular, EPA improperly failed to include carryover cellulosic RINs in "the projected volume available."

---

[1] Unless otherwise noted, statutory citations are to Title 42, U.S. Code.

1

EPA recognizes that the phrase "the projected volume available during that calendar year" refers to the volume of cellulosic biofuel that is available to obligated parties to satisfy their RFS obligations for the year in question. EPA also acknowledges that cellulosic volumes reflected in carryover RINs are available for compliance. And EPA concedes that it is reasonable to construe "the projected volume available" to include volumes reflected in carryover RINs. Yet EPA rejected that interpretation, instead reading "the projected volume available" to include only the *current year*'s domestic production plus net imports. EPA thus refused to count the portion of the prior year's production and net imports that was not used for compliance in that prior year and therefore remains available for compliance in the current year in the form of carryover RINs. In other words, EPA construed "the projected volume available" to include only a *subset* of the volume that is actually available to obligated parties for compliance. EPA's interpretation is contrary to the statute, unreasonable, and arbitrary and capricious.

EPA also purported to reach the same result based on a separate statutory provision, which authorizes EPA to modify or "reset" the statutorily required volumes in certain circumstances. Under the statute, however, a "reset" is simply a multi-year prospective waiver; it allows EPA to reset the required volumes for multiple future years all at once, rather than year by year. Accordingly, because EPA is required to include carryover RINs in the adjusted cellulosic volume under

2

its cellulosic waiver authority, it must do the same under its reset authority as well. Indeed, EPA itself recognizes that its cellulosic waiver and reset authorities should produce the same required volumes here. Any other result in this case would be contrary to the statute, unreasonable, and arbitrary and capricious.

In setting the required cellulosic volumes below the volumes that are actually available for compliance, EPA not only contravened the statute, but also undermined the RFS's central purpose of promoting the production of beneficial renewable fuels. Production of cellulosic biofuel has consistently lagged far behind what Congress envisioned. Yet rather than encouraging cellulosic production, EPA's approach suppresses cellulosic demand, undercutting incentives to invest in the new technologies necessary to increase production.

The petitions of the biofuels petitioners should be granted.

## JURISDICTION

These consolidated cases challenge final EPA action under the Clean Air Act, entitled *Renewable Fuel Standard Program: Renewable Fuel Standard Annual Rules*, 87 Fed. Reg. 39,600 (July 1, 2022). JA1. The biofuels petitioners filed timely petitions on August 29 and 30, 2022. This Court has jurisdiction under 42 U.S.C. § 7607(b)(1).

## STATEMENT OF ISSUES

1.     Whether EPA's failure to include carryover cellulosic RINs in "the projected volume available during [each] calendar year" from 2020 through 2022 under its cellulosic waiver authority, § 7545(*o*)(7)(D)(i), was contrary to the statute, unreasonable, arbitrary and capricious, or otherwise not in accordance with law.

2.     Whether EPA's failure to include carryover cellulosic RINs in the modified applicable volume of cellulosic biofuel established for 2020 through 2022 under its reset authority, *see* § 7545(*o*)(7)(F), was contrary to the statute, unreasonable, arbitrary and capricious, or otherwise not in accordance with law.

## STATUTE

Section 7545(*o*) is reproduced in the Addendum.

## STATEMENT OF THE CASE

### A.     The Renewable Fuel Standard Program

"Congress intended the [RFS] Program to be a 'market forcing policy' that would create 'demand pressure to increase consumption' of renewable fuel." *Am. Fuel & Petrochem. Mfrs. v. EPA*, 937 F.3d 559, 568 (D.C. Cir. 2019) (per curiam) (quoting *Americans for Clean Energy v. EPA* ("*ACE*"), 864 F.3d 691, 705 (D.C. Cir. 2017)).     The program's core consists of statutorily specified "'applicable volume[s]'—mandatory and annually increasing quantities of renewable fuels that must be 'introduced into commerce in the United States' each year." *Id.* (quoting § 7545(*o*)(2)(A)(i)).     The volume requirements address four "nested" categories of

4

renewable fuel: "[1] cellulosic biofuel and [2] biomass-based diesel are kinds of [3] advanced biofuel, and advanced biofuel in turn is a kind of renewable fuel that may be credited toward [4] the total renewable fuel obligation." *ACE*, 864 F.3d at 697-98; *see* § 7545(*o*)(2)(B)(i)(I)-(IV). Conventional corn starch ethanol is the other fuel type that counts toward the total renewable fuel obligation alongside advanced biofuel. *See* § 7545(*o*)(1)(F), (2)(B).

The default applicable volumes are specified in a series of statutory tables, which establish required volumes for renewable fuel, advanced biofuel, and cellulosic biofuel for 2006 through 2022. *See* § 7545(*o*)(2)(B)(i)(I)-(III).[2] "For 2006, Congress ordained the inclusion of 4 billion gallons of renewable fuel in the Nation's fuel supply," and by 2022, the number "climb[s] to 36 billion gallons." *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2175 (2021). For cellulosic biofuel, the default applicable volumes increase from 0.1 in 2006 to 16.0 billion gallons in 2022. § 7545(*o*)(2)(B)(i)(III).

EPA's overarching "'statutory mandate'" "each year[]" is "to 'ensure[]' that those [volume] requirements are met." *ACE*, 864 F.3d at 697-99 (quoting § 7545(*o*)(3)(B)(i)). "EPA fulfills that mandate by translating the annual volume requirements into 'percentage standards,'" which "represent the percentage of

---

[2] The table for biomass-based diesel runs from 2006 through 2012. *See* § 7545(*o*)(2)(B)(i)(IV).

transportation fuel introduced into commerce that must consist of renewable fuel." *Id.* at 699; *see* § 7545(*o*)(3)(B). "Each obligated party"—refiners and importers of transportation fuel—"must ensure" that the specified percentage of the transportation fuel it uses is renewable. *Alon Ref. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 637 (D.C. Cir. 2019). "If each obligated party meets the required percentage standards, then the Nation's overall supply of … renewable fuel will meet the total volume requirements set by EPA." *ACE*, 864 F.3d at 699.

EPA also "establish[ed] a 'credit program' through which obligated parties can acquire and trade credits and thereby comply with" their volume obligations. *Id.* "Each credit represents the blending of a certain quantity of renewable fuel." *HollyFrontier*, 141 S. Ct. at 2175. These credits—RINs—may be "retired" when used to show compliance, or they can be "traded on the open RIN market," *ACE*, 864 F.3d at 699, where they can be purchased by "a different producer that needs them," *HollyFrontier*, 141 S. Ct. at 2175.

If not retired in the year in which they are generated, RINs may be carried over to satisfy volume obligations for the following year. *See* § 7545(*o*)(5)(C); 40 C.F.R. § 80.1428(c). The total volume of such "carryover" RINs is known as the "RIN bank." *ACE*, 864 F.3d at 699, 715 n.3. In addition, if an obligated party "is unable to generate or purchase sufficient credits in a given year, it may 'carry forward' any deficit to the following year." *HollyFrontier*, 141 S. Ct. at 2175

6

(quoting § 7545(*o*)(5)(D)).  In that following year, the obligated party then "must offset the deficit it carried forward."  *Id.* (citing  § 7545(*o*)(5)(D)(ii)).

### B.    EPA's Waiver Authorities

Congress also gave EPA a set of "waiver" authorities, which "allow[] EPA to reduce the statutory volume requirements," *ACE*, 864 F.3d at 698, but "only in limited circumstances," *Nat'l Petrochem. & Refs. Ass'n v. EPA*, 630 F.3d 145, 149 (D.C. Cir. 2010); *see* § 7545(*o*)(7)(A)-(E).  One is the cellulosic waiver, which has both mandatory and discretionary components.  Under the mandatory cellulosic waiver, if EPA determines that the "projected volume of cellulosic biofuel production" in the upcoming year will be less than the volume specified in the statutory table, EPA "shall reduce" the required cellulosic volume down to "the projected volume available during that calendar year."  § 7545(*o*)(7)(D)(i).  In making that projection, EPA may not "adopt a methodology in which the risk of overestimation is set deliberately to outweigh the risk of underestimation" or vice versa, but must instead must "take neutral aim at accuracy." *Am. Petrol. Inst. v. EPA*, 706 F.3d 474, 476, 479 (D.C. Cir. 2013).

If EPA exercises the mandatory cellulosic waiver, EPA may exercise the discretionary cellulosic waiver.  In particular, having reduced the applicable volume of cellulosic biofuel, EPA "may also reduce the applicable volume of renewable fuel and advanced biofuels … by the same or a lesser volume."  § 7545(*o*)(7)(D)(i).

7

"Under the cellulosic waiver authority, … EPA has reduced the statutory target for cellulosic biofuel in every year since 2010 and the statutory targets for advanced biofuel and total renewable fuel in every year since 2014."  JA158; *see* JA7 (similar). Indeed, "[a]ctual production of cellulosic biofuel … has been significantly less than the statutory volumes," and "[t]he significant shortfalls in advanced biofuel and total renewable fuel for more recent years are primarily the result of shortfalls in cellulosic biofuel."  JA165, JA178.

If EPA exercises its mandatory cellulosic waiver authority, EPA also must make certain "credits"—known as cellulosic waiver credits—available for sale at prescribed prices tied to the wholesale price of gasoline.  § 7545(*o*)(7)(D)(ii). Obligated parties may purchase cellulosic waiver credits from EPA and use them to fulfill their cellulosic volume obligations (though not their advanced or total renewable volume obligations).  40 C.F.R. §80.1456(b).  Cellulosic waiver credits do not represent any physical volume of cellulosic or other renewable fuel, but instead provide an escape-valve compliance mechanism, with payments going to EPA.

In addition to the cellulosic waiver, EPA also may issue a "general" waiver of any nationwide volume requirement if it determines that (1) "implementation of the requirement would severely harm the economy or environment of a State, a region,

8

or the United States" or (2) "there is an inadequate domestic supply" of renewable fuel. § 7545(*o*)(7)(A).

### C.    EPA's Reset Authority

Congress also gave EPA authority to modify or "reset," JA3, the applicable volumes in the statutory tables under certain circumstances. For a given category of renewable fuel, if EPA invokes its waiver authorities to reduce the applicable volume by at least 20 percent for two consecutive years or at least 50 percent for a single year, EPA "shall promulgate a rule … that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies." § 7545(*o*)(7)(F).

When modifying the statutory targets in a reset, EPA must "comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii)," the provision governing how EPA sets applicable volumes for years not included in the tables. *Id.* Under that provision, EPA must set the applicable volumes "based on a review of the implementation of the program during the calendar years specified in the tables, and an analysis of" certain factors, including impacts on the environment, impacts on energy security, the expected annual rate of commercial biofuel production, impacts on infrastructure, impacts on consumer fuel costs, and impacts on other factors, such as job creation, agricultural commodities, rural economic development,

9

and food prices.  § 7545(*o*)(2)(B)(ii).  EPA first exercised its reset authority in the final rule at issue.

### D.    The 2020 Final Rule

Until 2020, EPA avoided deciding whether, under the mandatory cellulosic waiver, "the projected volume available in [a] calendar year" must or should include carryover cellulosic RINs.  In its final rule for 2014 through 2016, EPA did not "substantively evaluate" this issue because it determined that the cellulosic RIN bank was too small to "make a difference."  *Renewable Fuel Standards for 2014, 2015 and 2016 and the Biomass-Based Volume for 2017: Response to Comments*, EPA-420-R-15-024, at 598 (Nov. 2015).  The final rules for 2017, 2018, and 2019 likewise did not address this issue.  *See* 81 Fed. Reg. 89746 (Dec. 12, 2016); 82 Fed. Reg. 58486 (Dec. 12, 2017); 83 Fed. Reg. 63704 (Dec. 11, 2018).

On February 6, 2020, EPA promulgated a final rule for 2020.  *See* 85 Fed. Reg. 7016 (Feb. 6, 2020).  As relevant here, EPA exercised its cellulosic waiver authority to reduce the required cellulosic volume by 9.91 billion gallons, down to "0.59 billion ethanol-equivalent gallons."  *Id.* at 7018.  In calculating "the projected volume available during [2020]," EPA did not include tens of millions of gallons of cellulosic biofuel available for compliance in the form of carryover cellulosic RINs. *See id.* at 7022.  EPA acknowledged that the statutory phrase "the projected volume available" refers to volumes that are "available to obligated parties for compliance,"

10

*id.* at 7024 n.28, and further acknowledged that carryover RINs are "available for compliance" and "available to satisfy the 2020 standards," *Carryover RIN Bank Calculations for 2020 Final Rule*, EPA-HQ-OAR-2019-0136-2052, at 4 (Dec. 3, 2019).  EPA further acknowledged that it would be "reasonable" to "construe 'the projected volume available' to include carryover RINs." *Renewable Fuel Standard Program – Standards for 2020 and Biomass-Based Diesel for 2021 and Other Changes: Response to Comments*, EPA-420-R-19-018, at 49 (Dec. 2019).  But EPA rejected that interpretation based on a belief that excluding carryover cellulosic RINs "strikes an appropriate balance between the interests of various stakeholders and best ensures the ongoing smooth implementation of the program." *Id.*

Various parties challenged the 2020 final rule, including the biofuels petitioners here, who challenged (among other things) EPA's failure to include carryover cellulosic RINs in "the projected volume available during [2020]."  This Court consolidated the various challenges, but after opening briefs were filed, EPA moved to hold the case in abeyance.  On March 30, 2021, this Court granted that motion.  *See* Order, *RFS Power Coal. v. EPA*, No. 20-1046, Doc. #1892343 (D.C. Cir. Mar. 30, 2021).  The case has been held in abeyance ever since.  *See* Order, *RFS Power Coal.*, No. 20-1046, Doc. #1968062 (D.C. Cir. Oct. 7, 2022) (most recent abeyance order).

### E.     The 2022 Final Rule

On July 1, 2022, EPA promulgated the final rule at issue.  *See* JA1.  As relevant here, EPA modified the previously-established cellulosic volume for 2020 and established the required cellulosic volumes for 2021 and 2022.  *Id.*  In so doing, EPA purported to exercise its reset authority, while "also independently justifying the 2020, 2021, and 2022 cellulosic biofuel volumes … under the cellulosic waiver authority."  JA3 & n.4.  Because EPA exercised its cellulosic waiver authority for 2020 through 2022, it issued cellulosic waiver credits for those years.  *See* JA17; *Cellulosic Waiver Credits Under the Renewable Fuel Standard Program*, EPA, https://bit.ly/3mZR9Td (last updated Oct. 19, 2022).

EPA did not set forth separate regulatory analysis for its cellulosic waiver and reset authorities.  Instead, EPA determined that, "[f]or cellulosic biofuel for 2020, 2021 and 2022, … the appropriate volume after analyzing the various [reset] factors is the projected volume available in each of those years."  JA9.  EPA noted that, "[f]or each year, this volume is equivalent to the resulting volume after exercise of the cellulosic waiver."  *Id.*  Accordingly, EPA explained that its "analysis [of the reset factors] subsumes [its] policy and technical rationale for exercising the cellulosic waiver authority as well," and thus the agency did "not provid[e] a separate analysis for the application of the cellulosic waiver authority."  *Id.*  EPA also acknowledged that, notwithstanding the agency's invocation of its reset

12

authority, "the legal arguments made by commenters supporting a change to include cellulosic carryover RINs in the cellulosic volume" were "still relevant." JA18.

On that understanding of its authorities, EPA modified the required cellulosic volume for 2020 "based on the actual volumes … used in the U.S. in 2020." JA3. EPA explained that, since it had first promulgated volume requirements for 2020, the COVID-19 pandemic and other factors had "adversely affected the ability of obligated parties … to achieve the intended volumes in the 2020 final rule," justifying a retroactive modification. *Id.* For 2021, EPA similarly established applicable volumes "equal to the actual volumes … that were used in the U.S. in 2021." JA3-4. For 2022, EPA established a required cellulosic volume "equal to the volume of qualifying cellulosic biofuel projected to be used in … 2022." JA4.

For each year, EPA explained that its "interpretation of the 'projected volume available' includes the volume of qualifying cellulosic biofuel projected to be produced or imported and available for use as transportation in the U.S. in that year." JA7. EPA's calculations thus did "not include cellulosic carryover RINs." *Id.* For 2020, therefore, EPA excluded approximately 38 million ethanol-equivalent gallons of cellulosic biofuel that were produced or imported in *2019* but remained "available" for compliance in *2020* as carryover cellulosic RINs. *See* JA17 n.95. Those 38 million gallons represent roughly 6 percent of the 2020 cellulosic volume requirement. *See id.* EPA likewise excluded carryover cellulosic RINs from its

calculations for 2021 or 2022. *See* JA7. As in the 2020 final rule, EPA acknowledged that it would be "reasonable" to "construe 'the projected volume available' to include carryover RINs." JA485. Yet EPA continued to interpret "the projected volume available" to be "equivalent to the projected number of cellulosic RINs *generated in the year* that are available for obligated parties to use for compliance," and thus did "not include[] available cellulosic carryover RINs in [its] projection of the projected volume available." JA17 (emphasis added).[3]

## SUMMARY OF ARGUMENT

I.    EPA exceeded its authority and acted in an unreasonable and arbitrary and capricious manner by failing to include carryover cellulosic RINs in its projection of the volume of cellulosic biofuel "available" for compliance under its cellulosic waiver authority. When EPA's cellulosic waiver authority is triggered, EPA must "reduce the applicable volume of cellulosic biofuel" in the statutory table "to the projected volume available during that calendar year." § 7545(*o*)(7)(D)(i). That mandate unambiguously requires EPA to include in its projection *all* volumes that are "available" for compliance, including volumes produced or imported in the

_____

[3] In December 2022, EPA proposed volume requirements for 2023 through 2025 pursuant to its so-called "set" authority under § 7545(*o*)(2)(D)(ii). *See* 87 Fed. Reg. 80582 (Dec. 30, 2022). While that proposed rule discusses carryover RINs, as do the biofuels petitioners' comments, EPA's "set" authority is not directly relevant to the biofuels petitioners' arguments here.

14

prior year and available for compliance in the current year as carryover RINs.  The statute thus precludes EPA's interpretation, whereby "the projected volume available during [a] calendar year" includes only a *subset* of the volume that is actually available for compliance—volumes produced or imported in the current year.  EPA's interpretation also is unreasonable because EPA has acknowledged that the relevant question is what volumes are available for compliance, which undisputedly includes carryover RINs.  And EPA also acted arbitrarily and capriciously, as its reading is at best a poor fit with the statutory text and context, is inadequately explained, and undermines the RFS's central goal of encouraging increased production of beneficial renewable fuels.

II.    EPA likewise exceeded its authority and acted in an unreasonable and arbitrary and capricious manner by failing to include carryover cellulosic RINs in the required cellulosic volumes under its reset authority.  EPA itself expressly—and correctly—determined that its cellulosic waiver and reset authorities require the same regulatory analysis and yield the same result.  Either way, the required volume is "the projected volume available."  Because EPA miscalculated that volume under its cellulosic waiver authority, it also miscalculated it under its reset authority.  Furthermore, the statutory text and structure make clear that the reset serves as a multi-year prospective waiver, subject to the same basic constraints as the waiver authority that triggered it unless an enumerated statutory factor warrants deviating

from that baseline.  And here, the statutory factors do *not* authorize such a deviation.  In any event, EPA's purported exercise of its reset authority was unreasonable, arbitrary, and capricious because it clashes with the statutory structure, EPA's own issuance of cellulosic waiver credits, and the basic purpose of the RFS as a market-forcing policy intended to incentivize increased investment and production.

## STANDING

The biofuels petitioners have standing.  They produce renewable fuels under the RFS—including cellulosic biofuels—and generate or own RINs.  JA689-690; JA790-791.  Petitioners challenge the 2022 final rule on the ground that EPA unlawfully set the cellulosic volume requirements for 2020 through 2022 too low, reducing demand for petitioners' products and the RINs they generate and own.  In the 2022 final rule, EPA acknowledged that "[e]ntities potentially affected by this final rule are those involved with the production … of … renewable fuels," JA1, and that "it could be favorable to biofuel producers for [EPA] to … count on carryover RINs as a basis to … minimize the reduction in the statutory volume targets," JA481; *see* JA490 (explaining that EPA's treatment of carryover cellulosic RINs reflects valuing "other … factors" over "the development of cellulosic biofuels").  The 2022 final rule accordingly has caused petitioners to suffer a concrete and particularized injury, which correcting EPA's errors would redress.

16

Indeed, "standing to seek review of administrative action is self-evident" if the petitioner "is an object of the action … at issue." *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (citation omitted).  Here, the 2020 volume requirements "directly regulate biofuel producers," *Am. Fuel*, 937 F.3d at 595, so "there should be little question that the action … has caused [them] injury, and that a judgment preventing or requiring the action will redress it," *Fund For Animals*, 322 F.3d at 734 (citation omitted).  This Court has routinely found that organizations representing biofuels producers have standing to challenge EPA actions under the RFS.  *E.g.*, *Alon*, 936 F.3d at 664-65; *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1015 (D.C. Cir. 2016); *Am. Fuel*, 937 F.3d at 591-96.

## STANDARD OF REVIEW

This Court "may reverse the EPA's actions under the [RFS] Program if [it] find[s] them to be 'arbitrary, capricious, [or] an abuse of discretion.'" *Am. Fuel*, 937 F.3d at 574 (quoting § 7607(d)(9)(A)).  To satisfy this standard, EPA must have "considered all of the relevant factors and demonstrated a reasonable connection between the facts on the record and the resulting policy choice."  *Id.* (brackets omitted).  The Court "also may reverse an EPA action under the Program if [it] determine[s] that it is 'otherwise not in accordance with law' or 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'"  *Id.*

17

(quoting § 7607(d)(9)(A), (C)).  "The court reviews the EPA's interpretation of the Clean Air Act under the familiar two-step [*Chevron*] framework."  *Id.*

## ARGUMENT

### I.    EPA Erred in Failing To Include Carryover Cellulosic RINs in "the Projected Volume Available" Under Its Cellulosic Waiver Authority

EPA "independently justifi[ed]" the required cellulosic volumes for 2020 through 2022 under its cellulosic waiver authority.  By statute, when that waiver is triggered, EPA "shall reduce the applicable volume of cellulosic biofuel" in the statutory table "to the projected volume available during that calendar year." § 7545(*o*)(7)(D)(i).  EPA erred in making those projections here.  By its plain meaning, the cellulosic volume "available" encompasses *all* cellulosic biofuel that is available to obligated parties for RFS compliance in 2020 through 2022.  That includes not only the volumes produced or imported in those calendar years, but also any portion of the previous year's production and imports that remains available for compliance in the form of carryover RINs.  In the 2022 final rule, however, EPA excluded carryover RINs, effectively reading the "volume available" to mean "some of the volume available, but not all."  EPA's interpretation and resulting undercount of "the projected volume available" contravenes the statute at *Chevron* step one, is unreasonable at *Chevron* step two, and is arbitrary and capricious.

18

A.    "The Projected Volume Available" Unambiguously Includes Carryover Cellulosic RINs

1.    *The Statutory Text, Structure, and Purpose Are Clear*

At *Chevron* step one, this Court asks "whether Congress has directly spoken to the precise question at issue," after "exhaust[ing] the traditional tools of statutory construction." *Am. Fuel & Petrochem. Mfrs. v. EPA*, 3 F.4th 373, 380 (D.C. Cir. 2021) (quotation marks omitted).  Here, starting with the text, the cellulosic waiver provision provides:

> For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), … [EPA] shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to *the projected volume available during that calendar year*.

§ 7545(*o*)(7)(D)(i) (emphasis added).  By its plain meaning, "the projected volume available during that calendar year" means *all* cellulosic volumes that obligated parties may use to comply with the RFS for the compliance year in question.  The ordinary meaning of "available" is something capable of being used by a particular person for a particular purpose.  *See Ross v. Blake*, 578 U.S. 632, 642 (2016); *English v. Trump*, 279 F. Supp. 3d 307, 322 (D.D.C. 2018).  Here, the projected volume "available" must mean the volume available to *obligated parties* for the purpose of *complying with the volume obligations under the RFS*.  Indeed, EPA acknowledges that whether particular volumes are part of "the projected volume available" depends on whether they are "available to obligated parties for compliance."  JA16.

19

That EPA acknowledgment comports with the statutory scheme. As this Court has noted in construing the RFS's general waiver provision, "it is the *refiners, blenders, and importers*"—*i.e.*, obligated parties—"who must have access to an adequate supply of renewable fuel in order to meet the … Program's statutory volume requirements." *ACE*, 864 F.3d at 708 (quotation marks omitted). That is "the only reasonable interpretation"; the statute is not "ambiguous." *Id.* at 707.

Obligated parties "comply with their renewable fuel obligations by accumulating or purchasing the requisite number of RINs." *ACE*, 864 F.3d at 699. By statute, RINs "shall be valid to show compliance for the 12 months as of the date of generation." § 7545(*o*)(5)(C). RINs thus are valid in two calendar years—the year in which they are generated, and the next year. Accordingly, by regulation, "a RIN is valid for compliance during the calendar year in which it was generated, or the following calendar year." 40 C.F.R. § 80.1428(c). In other words, whether the renewable fuel reflected in a given RIN is "available" for compliance in a given year does *not* depend on whether that fuel was produced or is physically available to consumers as transportation fuel during that same year. Indeed, EPA has repeatedly described carryover RINs as "available for compliance," JA15, JA18-19, JA30 & n.164, and as "a valid compliance mechanism" whose "availability" is an "important factor" in EPA's administration of the RFS, 80 Fed. Reg. 77420, 77484-85 & n.153 (Dec. 14, 2015). This Court, too, has described carryover RINs as "available for

20

compliance." *Monroe Energy LLC v. EPA*, 750 F.3d 909, 918 (D.C. Cir. 2014); *see Am. Fuel*, 937 F.3d at 582 (similar).

The statutory structure reinforces that "the projected volume available" must include cellulosic volumes reflected in carryover RINs. "Where Congress uses certain language in one part of a statute and different language in another, it is presumed that Congress acts intentionally," *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012)—"especially" where different words "are used in the same sentence," *N.E. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 12 (D.C. Cir. 2011) (quotation marks omitted). Here, the first sentence of the mandatory cellulosic waiver provision uses three volumetric terms—"minimum applicable volume," "the projected volume of cellulosic biofuel production," and "the projected volume available." § 7545(*o*)(7)(D)(i). "[M]inimum applicable volume" undisputedly refers to the numerical values set forth in the statutory table. *See* § 7545(*o*)(2)(B). The remaining two terms—"the projected volume of cellulosic biofuel production" and "the projected volume available"—cannot both mean the same thing. Rather, "the projected volume of cellulosic biofuel *production*" refers to cellulosic biofuel projected to be *produced* during the year in question, while "the projected volume *available*" refers to volume projected to be *available* to obligated parties for compliance during that year. The volume *available* to obligated parties for compliance, in turn, necessarily includes the portion of the prior year's production

21

and net imports that was *not* used for compliance during that year, and therefore remains available for compliance in the current year in the form of carryover RINs.

Including carryover RINs in "the projected volume available" also is consistent with the purpose of the RFS in general and the mandatory cellulosic waiver provision in particular. The RFS is a "market forcing policy intended to overcome constraints in the market by creating demand pressure to increase consumption of renewable fuels." *ACE*, 864 F.3d at 710 (quotation marks omitted). Excluding carryover RINs from "the projected volume available" undermines that goal by causing supply to consistently exceed demand in the cellulosic RIN market, thereby depressing cellulosic RIN prices and discouraging investment in cellulosic production. That is the opposite of "creating demand pressure." *Id.*

To explain, once a cellulosic RIN bank emerges, excluding carryover RINs from "the projected volume available" means that the number of cellulosic RINs obligated parties must retire for compliance will be less than the total number of RINs actually available for compliance. Accordingly, unless some other event intervenes to draw the cellulosic RIN bank down, extra cellulosic RINs will be carried forward into the next year, and then the year after that, and so on, resulting in a persistent RIN surplus. Under basic principles of supply and demand, a persistent surplus pushes prices downward, and lower prices—or even expectations thereof—reduce incentives to invest in increased production. *Including* carryover

22

cellulosic RINs in "the projected volume available," by contrast, ensures that the *entire* supply of RINs available for compliance—current-year RINs and carryover RINs—is met with appropriate demand. *See* JA656-659, JA667-669.[4]

Including carryover cellulosic RINs in "the projected volume available" also furthers the purpose of the mandatory cellulosic waiver provision. That provision "serves as a non-discretionary safety valve when [obligated parties] would otherwise be put in an impossible position, or at least a highly punitive one—that is, forced to purchase volumes of cellulosic biofuel greater than total production, or pay fines for failing to do so." *Am. Petrol.*, 706 F.3d at 479. In other words, the mandatory cellulosic waiver, like the general waiver, "is just that: a waiver provision. It authorizes EPA to ease the … Program's requirements *when complying with those requirements would be infeasible*." *ACE*, 864 F.3d at 708 (emphasis added). In directing EPA to reduce the required cellulosic volume to "the projected volume available," Congress ensured that the mandatory cellulosic waiver would waive only infeasible requirements, while leaving feasible requirements in place. Including carryover RINs in the cellulosic volume "available" fits with that purpose, as using carryover RINs for compliance is perfectly feasible. Excluding carryover RINs, by contrast, eases RFS obligations *unnecessarily*, contrary to the waiver's purpose.

---

[4] The surplus provided by the RIN bank is in addition to any further surplus provided by cellulosic waiver credits, discussed below. *Infra*, pp. 27-29, 32-33.

2.    *EPA's Contrary Interpretation Is Erroneous*

EPA's explanation for its interpretation of "the projected volume available" in the 2022 final rule is unconvincing.  In framing the issue, EPA asserts that "there are multiple possible interpretations" and "multiple reasonable constructions" of the mandatory cellulosic waiver provision.    JA17, JA485.    In EPA's view, "[o]ne reading is to construe 'the projected volume available' as a shortened reference to the 'projected volume of cellulosic biofuel production,'" such that "both refer only to projected production."  JA485-486 & n.42.  No party here advocates that reading. A second reading, advocated by the biofuels petitioners, "construe[s] 'the projected volume available' to include carryover RINs."  *Id.*  The third reading—EPA's reading—"construe[s] 'the projected volume available' to mean all cellulosic biofuel produced in that year, which will be available for use in the United States."  *Id.*  EPA asserts that these readings are all permissible because "the provision does not specifically address" carryover RINs—a term "created by EPA"—nor does it "refer to the credit provisions … under which EPA created the RIN program."  JA484-485.

In fact, Congress *did* "specifically address" the issue of carryover RINs through use of the term "the projected volume available," whose plain meaning encompasses volumes reflected in carryover RINs.  Indeed, by providing that renewable fuel credits may be used for compliance in *two* calendar years, *see* § 7545(*o*)(5)(C), Congress expressly contemplated that cellulosic biofuel produced

24

or imported in one year could be "available" for compliance the next year. Regardless, exactly *how* the statute and EPA's regulations make particular volumes "available" for compliance in a given year does not matter. What matters is *whether* those volumes are "available." Because carryover RINs are "available," they must be included in "the projected volume available." The "volume available" means *all* of the volume available, not just some.

Furthermore, EPA ignores that its reading effectively inserts words into the statute that Congress chose to omit. In EPA's view, "the projected volume available during that calendar year" means "the projected volume *produced and* available *to consumers* during that calendar year." But that is not what Congress wrote. "[EPA]'s construction of the statute would require [this Court] to write a restriction into the text that is not there. [This Court] will not do that." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 978 (D.C. Cir. 2022). Moreover, in the context of EPA's general waiver authority, this Court has rejected the notion that the relevant volumes are those available for use *by consumers*. Rather, "it is the *refiners, blenders, and importers*—not consumers—who must 'use' the statutorily required volumes of renewable fuel." *ACE*, 864 F.3d at 708. That is "the only reasonable interpretation." *Id.*

EPA also asserts that its reading is "consistent with [its] interpretation in past annual rulemakings." JA485. That is misleading. In 2013, EPA *included* carryover

RINs in the required volumes of advanced biofuel and total renewable fuel established under EPA's discretionary cellulosic waiver authority.  *See* 78 Fed. Reg. 49794, 49797 (Aug. 15, 2013); *supra*, pp. 7-8 (describing discretionary cellulosic waiver).  Foreshadowing the biofuels petitioners' arguments here, EPA explained that "carryover RINs are available," that "carryover RINs are a valid compliance mechanism," and that "a significant number of carryover RINs from 2012 … could be used to fulfill part of the 2013 advanced biofuel requirement."  78 Fed. Reg. at 49813, 49822.  After 2013, EPA avoided substantively addressing the meaning of "the projected volume available" under the mandatory cellulosic waiver provision until the 2020 final rule, and the biofuels petitioners' challenge to that rule has been stayed.  *See supra*, p. 10.  Furthermore, EPA reopened the issue here by inviting comments and considering alternative approaches.  *See* JA93, JA98-99; *P & V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1023-24 (D.C. Cir. 2008).

Finally, EPA cites this Court's holding in *ACE* that EPA is not required to consider carryover RINs when determining whether there is "inadequate domestic supply," triggering EPA's general waiver authority.  *See* JA485 & n.41; JA525-526, JA528.  But that holding from *ACE* is irrelevant here because the cellulosic waiver provision differs from the general waiver provision in two important ways.  First, the statutory text is different—the key term for the cellulosic waiver is "the projected volume available," while the key term for the general waiver is "inadequate domestic

supply."  *ACE* carefully analyzed the text of the general waiver provision, *see* 864 F.3d at 714, but did not opine on the meaning of "the projected volume available" in the cellulosic waiver provision.

Second, while carryover RINs may play an important backstop role in other RIN markets, other mechanisms fill that role for cellulosic RINs.  In *ACE*, this Court credited EPA's explanation that, "were [EPA] to consider carryover RINs as a supply source  …, the number of carryover RINs would be reduced to almost zero," eliminating critical "flexibility and liquidity provided by carryover RINs."  *Id.* at 715.  Whatever the merits of that rationale in other contexts, it does not apply to cellulosic RINs.[5]  That is because the statute requires EPA, whenever the mandatory cellulosic waiver is triggered, to enable obligated parties to satisfy their cellulosic volume obligations by purchasing cellulosic waiver credits.  *See* § 7545(*o*)(7)(D)(ii); 40 C.F.R. § 80.1456.  Congress expressly directed EPA to sell cellulosic waiver credits at predetermined prices "to assist market liquidity and transparency" and "to provide appropriate certainty for regulated entities and renewable fuel producers." § 7545(*o*)(7)(D)(iii).  Indeed, the 2022 final rule acknowledges that cellulosic waiver credits provide obligated parties with "important compliance flexibilit[y]."  JA17.

---

[5] The statute establishes a unique scheme for the cellulosic biofuel market.  The biofuels petitioners take no position in this case on EPA's rationale for maintaining a RIN bank for other fuel categories.

In the cellulosic context, cellulosic waiver credits are the statutory mechanism Congress established to ensure that obligated parties can comply with their volume obligations—not a RIN bank.

EPA notes that cellulosic waiver credits "are not a full replacement for cellulosic RINs" because, "to satisfy their cellulosic biofuel obligation, obligated parties must retire either a cellulosic RIN or a cellulosic waiver credit plus an advanced RIN." JA17. But that does not matter. Congress expressly considered obligated parties' ability to comply with their cellulosic volume obligations, and it provided a mechanism to address that problem—cellulosic waiver credits. EPA's apparent preference for carryover RINs over cellulosic waiver credits as a source of compliance flexibility is not a reason to rewrite the statute.

Nor does it matter that cellulosic waiver credits are available only when the mandatory cellulosic waiver is triggered, which EPA predicts is "unlikely" to happen in 2023. JA17. If EPA sets the required cellulosic volume for 2023 appropriately, cellulosic RINs generated in that year will suffice to satisfy obligated parties' cellulosic obligations, and cellulosic waiver credits will not be needed. Conversely, if the required cellulosic volume for 2023 were too high, EPA has taken the view that the cellulosic waiver would be triggered, making cellulosic waiver credits available. *See* 87 Fed. Reg. at 80624. And to the extent obligated parties need

additional compliance flexibility, they can use carryover deficits.  *See* § 7545(*o*)(5)(D).

In other words, if the program is functioning properly, the fact that cellulosic waiver credits are not available in a given year indicates that obligated parties do not need the liquidity those credits provide.  And if liquidity is needed, EPA has indicated that cellulosic waiver credits will be available because the mandatory cellulosic waiver will be triggered.  That is not an accident—it is how the statute is designed.

## B.    EPA's Reading of "the Projected Volume Available" Is Unreasonable

Even if the statute were ambiguous, EPA's interpretation of the mandatory cellulosic waiver provision is unreasonable at *Chevron* step two.  "The 'reasonableness' of an agency's construction depends, in part, on the construction's 'fit' with the statutory language, as well as its conformity to statutory purposes." *Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006) (quotation marks omitted). Reasonableness also depends on whether the agency's interpretation is "adequately explained." *Id.* at 882.

Here, as explained above, EPA's interpretation is a poor fit with the statutory text and context.  It is "[a]t best … counterintuitive," *id.* at 881, to read the phrase "the projected volume available during that calendar year" to include some—but not

all—of the volumes obligated parties actually may count toward their volume obligations in that year.

EPA's interpretation also is "not adequately explained." *Id.* at 882. EPA has long recognized that "the projected volume available during that calendar year" cannot mean the year's *production*, whether domestic or global, because cellulosic biofuel can be imported and exported. Exported volumes, for example, are "not *available* for qualifying domestic use." JA485 (emphasis added). Accordingly, as EPA itself explained in the 2020 final rule, the volume "available" under § 7545(*o*)(7)(D)(i) is the volume "available to obligated parties for compliance." 85 Fed. Reg. at 7023-24 n.28. If what matters, however, is the volume that is "available to obligated parties for compliance," then there is no basis to include *some* volumes available for compliance (current-year domestic production plus net imports) but exclude others (the portion of prior-year production plus net imports that remains available for compliance in the form of carryover RINs).

EPA asserts that net imports and carryover RINs "are two distinct issues," JA487, but that is wrong. The word "available" either refers to volumes that obligated parties can use for compliance, or it does not. "*Chevron* … does not license interpretive gerrymanders under which an agency keeps parts of statutory context it likes while throwing away parts it does not." *Michigan v. EPA*, 576 U.S. 743, 754 (2015).

Finally, EPA's interpretation clashes with the "statutory purpose[]." *Goldstein*, 451 F.3d at 881  Again, the RFS is a "market forcing policy," *ACE*, 864 F.3d at 710 (citation omitted), and cellulosic biofuels are where the program has fallen farthest short of Congress's goals, *see* JA165, JA178.  Yet instead of "creating demand pressure to increase consumption of [cellulosic biofuel]," *ACE*, 864 F.3d at 710 (quotation marks omitted), EPA's interpretation *relieves* demand pressure, allowing cellulosic production to continue vastly undershooting the volumes Congress envisioned.  That is unreasonable.

### C.    EPA's Reading of "the Projected Volume Available" Is Arbitrary and Capricious

For similar reasons, even if excluding volumes reflected in carryover RINs were *theoretically* permissible, selecting that interpretation here was arbitrary and capricious.  To begin with, EPA's reasoning in the 2020 final rule is "internally inconsistent."  *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).  Again, EPA included net imports in "the projected volume available" because domestic production plus net imports is what is available to obligated parties for compliance.  But the portion of prior-year production and net imports that is reflected in carryover RINs *also* is available for compliance.  So, by EPA's own logic, carryover RINs should be included as well.

EPA also erroneously relied on the "compliance flexibilit[y]" carryover RINs provide.  JA17; *see* JA488 (similar).  As explained, cellulosic waiver credits provide

compliance flexibility for cellulosic volume requirements. *See supra*, pp. 27-29. Furthermore, although cellulosic waiver credits are an imperfect substitute for cellulosic RINs due to the fact that obligated parties also must retire advanced RINs, *see* JA17, advanced RINs are relatively abundant, *see* JA2. Indeed, the market has treated advanced biofuel "as the marginal RFS compliance option when other sources of conventional biofuel were not available at competitive prices." JA483. And EPA could maintain an advanced RIN bank while still drawing down the cellulosic RIN bank.

EPA also predicts that it will not issue cellulosic waiver credits in 2023. *See* JA17. If that prediction is right, however, it means that obligated parties do not need the flexibility those credits provide. *See supra*, pp. 28-29. And regardless, obligated parties facing compliance difficulties can make use of carryover deficits. *See* § 7545(*o*)(5)(D). EPA offers no reason whatsoever why such deficits are insufficient to provide any needed flexibility.

EPA also asserts that drawing down the cellulosic RIN bank "would increase the likelihood of retroactive waivers of established standards when unforeseen circumstances result in less supply than EPA anticipated," "undermin[ing] … regulatory certainty." JA488. That is speculation, however, and this very rulemaking demonstrates that EPA believes it can effectively address unforeseen supply disruptions. Moreover, in attempting to ensure regulatory certainty for

obligated parties, EPA increased economic uncertainty for biofuel producers and investors, undermining the reliable price signals they need to increase cellulosic production.

Most fundamentally, EPA improperly brushed aside that its interpretation undermines the RFS's "market forcing policy." *ACE*, 864 F.3d at 710 (citation omitted). EPA itself "recognize[s] that the potential for lower cellulosic RIN prices could have a directionally negative impact on cellulosic biofuel investment." JA17. That alone should have caused EPA to reconsider. But instead, EPA attempted to minimize the importance of carryover RINs and RIN prices, reasoning that the fall in RIN prices in 2019-2020 was "the result of more than just the availability of cellulosic carryover RINs," and that EPA has separately addressed "several of the factors that … led to th[at] drop in cellulosic RIN prices." *Id.* EPA also noted that "cellulosic biofuel production has increased significantly each year since 2014," and concluded that it did "not believe that changing [its] interpretation of the 'projected volume available' to include cellulosic carryover RINs is at this point necessary to ensure future growth in cellulosic biofuels." JA18; *see* JA487 (similar).

EPA's focus on other determinants of cellulosic investment, however, ignores two indisputable facts: (1) cellulosic production continues to lag far behind Congress's goals, and (2) excluding carryover cellulosic RINs from "the projected

volume available" makes that problem worse, not better.  In failing to confront these fundamental points, EPA acted arbitrarily and capriciously.

## II.    EPA Erred in Failing To Include Carryover Cellulosic RINs in the Modified Applicable Volumes Under its Reset Authority

Just as the volumes EPA established for 2020 through 2022 contravene the limits on EPA's cellulosic waiver authority, they also contravene the limits on its reset authority.  In every annual RFS rulemaking since 2010, EPA has waived the vast majority of the statutory cellulosic volume, triggering EPA's reset authority.  *See* JA8 & n.30.  When a reset is triggered, EPA must "modif[y] the applicable volumes," while "comply[ing] with the processes, criteria, and standards set forth in paragraph (2)(B)(ii)."  § 7545(*o*)(7)(F).  That paragraph in turn directs EPA to set the applicable volumes "based on a review of the implementation of the program during the calendar years specified in the tables, and an analysis of" certain factors.  § 7545(*o*)(2)(B)(ii).

Here, EPA correctly determined that, for cellulosic biofuel, "the appropriate volume after analyzing the various factors is the *projected volume available* in each … year[]," which "is equivalent to the resulting volume *after exercise of the cellulosic waiver*."  JA9 (emphases added).  EPA accordingly explained that its reset analysis "subsumes [its] policy and technical rationale for exercising the cellulosic waiver authority as well," and did "not provid[e] a separate analysis for the application of the cellulosic waiver authority."  *Id.*  EPA further acknowledged that

34

commenters' legal arguments regarding EPA's cellulosic waiver authority were "still relevant" in the reset context. JA18. In short, EPA chose to apply the same standard under its reset authority that the statute mandates under its cellulosic waiver authority—either way, the required cellulosic volume is "the projected volume available." Accordingly, because EPA miscalculated "the projected volume available" under its cellulosic waiver authority, it also miscalculated that volume under its reset authority.

Nevertheless, the 2022 final rule asserts that, "[e]ven were EPA's interpretation of 'projected volume available' erroneous, we would nonetheless reduce the cellulosic biofuel volumes to the final volumes we are establishing in this document (not including carryover RINs) utilizing the reset authority." *Id.* But EPA's effort to use its reset authority to shore up its erroneous interpretation of its cellulosic waiver authority is misplaced. EPA cannot with one breath claim that its reset authority aligns perfectly with its cellulosic waiver authority, and then in the next breath claim that the two authorities are completely independent, such that its reset analysis would not change even if its waiver analysis were completely wrong. Indeed, the text and structure of the reset provision make clear that the reset is a prospective multi-year waiver, subject to the same basic constraints as the waiver authority that triggered it. The statutory reset factors certainly give EPA no authority to *exclude* the same carryover cellulosic RINs that are required to be *included* under

EPA's cellulosic waiver authority.  EPA's purported exercise of its reset authority contravenes the statute, is unreasonable, and is arbitrary and capricious.

## A.  The Modified Applicable Volume Under a Reset Unambiguously Must Include Carryover Cellulosic RINs

At *Chevron* step one, if EPA is required to include carryover cellulosic RINs in the adjusted cellulosic volume under its cellulosic waiver authority—and as explained above, it is—then EPA must do the same under its reset authority.

The statutory text and structure make clear that EPA cannot exclude carryover cellulosic RINs from the required cellulosic volume in a reset.  Starting with the text, Congress expressly tied EPA's reset authority to its waiver authorities, directing EPA to reset a volume requirement only if it "waives" a significant portion of that requirement in a single year or two consecutive years.  § 7545(*o*)(7)(F).  And once a reset is triggered, EPA must "modif[y] the applicable volumes set forth in the table concerned for all years following the final year to which the [triggering] waiver applies."  *Id.*  Structurally, the reset serves as an alternative to the annual waiver process when it has become clear that such waivers likely will be triggered in many or all years remaining in the statutory table.  In that circumstance, the reset enables EPA to "modif[y]" the applicable volume for the remaining years in the table all at once, rather than piecemeal, year by year.  Because the reset functions as a prospective, multi-year waiver, the basic scope of EPA's reset authority should

36

mirror the scope of the triggering waiver authority, unless an enumerated statutory factor warrants departing from that baseline.

Here, none of the statutory reset factors authorizes EPA to exclude carryover cellulosic RINs from the modified required cellulosic volume. To the contrary, the statute requires EPA to reset the applicable volume "based on a review of the implementation of the program during the calendar years specified in the tables." § 7545(*o*)(2)(B)(ii). As explained above, however, in implementing the program before a reset, EPA is required to *include* carryover cellulosic RINs in the adjusted applicable volume under its cellulosic waiver authority. And here, EPA's reset authority was triggered by repeated cellulosic waivers. Accordingly, the "implementation of the program" factor provides no authority for EPA to *exclude* carryover cellulosic RINs.

Nor do the remaining reset factors provide that authority. None of those factors has anything to do with the inclusion or exclusion of carryover cellulosic RINs. The factors instead concern larger considerations—environmental impacts, energy security, the rate of renewable fuel production, impacts on consumers, and impacts on job creation, agricultural commodities, rural economic development, and food prices. *See* § 7545(*o*)(2)(D)(ii). Tellingly, the 2022 final rule discusses carryover RINs *only* in relation to the "implementation of the program" factor—not any other reset factor. *See* JA14.

37

To be clear, these other reset factors potentially could allow EPA to set the modified cellulosic volume lower (or higher) than it would have had it simply exercised its cellulosic waiver authority.  But nothing in those factors justifies EPA lowering the required cellulosic volume *by excluding carryover cellulosic RINs*.  In the cellulosic waiver provision, "Congress has directly spoken to th[at] precise question," *Am. Fuel*, 3 F.4th at 380 (citation omitted), and EPA cannot use its generalized authority under the reset provision to override Congress's specific directive about the proper treatment of carryover RINs.

If anything, the additional reset factors reinforce that EPA must *include* carryover cellulosic RINs in the modified applicable volume, not exclude them. Congress commanded EPA to consider "the expected annual rate of future commercial production of renewable fuels, including … cellulosic biofuel," § 7545(*o*)(2)(D)(ii)(III), underscoring the importance of production incentives. Again, cellulosic production has grown far slower than Congress envisioned, and including carryover RINs in the required cellulosic volume encourages the investment necessary to bring production in line with the statutory goals.

**B.    EPA's Use of its Reset Authority To Exclude Carryover Cellulosic RINs Is Unreasonable, Arbitrary, and Capricious**

Even if the reset provision were ambiguous, EPA's interpretation is unreasonable at *Chevron* step two and arbitrary and capricious—for four reasons.

First, EPA chose to tie the exercise of its reset authority to its cellulosic waiver authority.  EPA expressly—and correctly—determined that "the appropriate volume after analyzing the various [reset] factors is the projected volume available," which is "equivalent to the resulting volume after exercise of the cellulosic waiver."  JA9.  EPA cannot reasonably calculate "the projected volume available" differently under its cellulosic waiver and reset authorities.  EPA itself decided that, either way, the resulting volume should be "equivalent."

Second, EPA's interpretation is at odds with the statutory structure.  "Even under *Chevron*'s deferential framework, agencies must operate within the bounds of reasonable interpretation," which "must account for both the specific context in which language is used and the broader context of the statute as a whole." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (cleaned up).  Here, as explained, the statute as a whole makes clear that a reset functions as a prospective, multi-year waiver, subject to the same basic constraints as EPA's cellulosic waiver authority.  It is unreasonable, arbitrary, and capricious for EPA to treat its reset authority as a license to rewrite the applicable volumes as it sees fit, unmoored from the structure Congress established for prior years.

Third, EPA issued cellulosic waiver credits for 2020 through 2022.  *See supra*, p. 12.  By statute, EPA may issue cellulosic waiver credits *only* when it "reduces the minimum cellulosic biofuel volume under [the mandatory cellulosic waiver

provision]." § 7545(*o*)(7)(D)(ii).  EPA regulations likewise provide that it "will provide cellulosic … waiver credits for purchase" only "[i]f EPA reduces the applicable volume of cellulosic biofuel pursuant to [the cellulosic waiver provision]." 40 C.F.R. §80.1456(a).  Exercising the reset authority does *not* trigger any statutory or regulatory authority to issue cellulosic waiver credits.  *See id.*; § 7545(*o*)(7)(F), (2)(D)(ii).

Accordingly, to justify the issuance of cellulosic waiver credits in 2020 through 2022, EPA *must* rely on its cellulosic waiver authority.  EPA has articulated no other basis for issuing cellulosic waiver credits.  And when exercising its cellulosic waiver authority, EPA *must* reduce the required cellulosic volume "to the projected volume available," § 7545(*o*)(7(D)(i), including volumes available as carryover RINs.  EPA cannot reasonably pretend that the cellulosic waiver credits it offered for three years—which obligated parties purchased and used to show compliance—never existed.  That would be the height of arbitrary and capricious agency action.

Fourth, excluding carryover cellulosic RINs from the required cellulosic volume again gives short shrift to the fundamental goal of the RFS as a "market forcing policy."  *ACE*, 864 F.3d at 710 (quotation marks omitted).  The biofuels petitioners are under no illusions that correcting EPA's miscalculation of "the projected volume available" will, on its own, return cellulosic production to the

40

trajectory Congress envisioned.  But EPA acknowledges that including carryover RINs in the required cellulosic volume is "reasonable."  JA485.  Given the choice between a reasonable approach that furthers Congress's goal of incentivizing cellulosic production and an alternative approach that does not, EPA should have chosen the former.  It was unreasonable, arbitrary, and capricious to do otherwise.

## CONCLUSION

The Court should grant the petitions for review, set aside the 2022 final rule, and remand for further proceedings consistent with the arguments above.

Respectfully submitted,

/s/ Ethan G. Shenkman

| | |
|---|---|
| Matthew W. Morrison | Ethan G. Shenkman |
| Cynthia Cook Robertson | Jonathan S. Martel |
| Shelby L. Dyl | William C. Perdue |
| PILLSBURY WINTHROP SHAW | Jillian M. Williams |
| PITTMAN LLP | ARNOLD & PORTER |
| 1200 Seventeenth Street NW | KAYE SCHOLER LLP |
| Washington, DC 20036 | 601 Massachusetts Avenue, NW |
| (202) 663-8007 | Washington, DC 20001 |
| | (202) 942-5000 |

*Counsel for Waste Management, Inc. and WM Renewable Energy, LLC*

*Counsel for Iogen Corp. and Iogen D3 Biofuel Partners II LLC*

September 19, 2023

41

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of this Court's order of February 1, 2023, because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 9,098 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ Ethan G. Shenkman
Ethan G. Shenkman

September 19, 2023

## CERTIFICATE OF SERVICE

I certify that on September 19, 2023, I caused a copy of this brief to be filed with the Clerk of the Court using the Court's case management/electronic case filing system, which will automatically serve notice of the filing on registered users of that system.

/s/ Ethan G. Shenkman
Ethan G. Shenkman

September 19, 2023

# ADDENDUM

# ADDENDUM

## TABLE OF CONTENTS

**STATUTES**                                                                 Page(s)

42 U.S.C. § 7545(*o*) ..................................................................... A1 – A8

from corn starch, that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

**(ii) Inclusions**

The types of fuels eligible for consideration as "advanced biofuel" may include any of the following:

(I) Ethanol derived from cellulose, hemicellulose, or lignin.

(II) Ethanol derived from sugar or starch (other than corn starch).

(III) Ethanol derived from waste material, including crop residue, other vegetative waste material, animal waste, and food waste and yard waste.

(IV) Biomass-based diesel.

(V) Biogas (including landfill gas and sewage waste treatment gas) produced through the conversion of organic matter from renewable biomass.

(VI) Butanol or other alcohols produced through the conversion of organic matter from renewable biomass.

(VII) Other fuel derived from cellulosic biomass.

**(C) Baseline lifecycle greenhouse gas emissions**

The term "baseline lifecycle greenhouse gas emissions" means the average lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, for gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

**(D) Biomass-based diesel**

The term "biomass-based diesel" means renewable fuel that is biodiesel as defined in section 13220(f) of this title and that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions. Notwithstanding the preceding sentence, renewable fuel derived from co-processing biomass with a petroleum feedstock shall be advanced biofuel if it meets the requirements of subparagraph (B), but is not biomass-based diesel.

**(E) Cellulosic biofuel**

The term "cellulosic biofuel" means renewable fuel derived from any cellulose, hemicellulose, or lignin that is derived from renewable biomass and that has lifecycle greenhouse gas emissions, as determined by the Administrator, that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

**(F) Conventional biofuel**

The term "conventional biofuel" means renewable fuel that is ethanol derived from corn starch.

**(G) Greenhouse gas**

The term "greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, ni-

**(*o*) Renewable fuel program**

**(1) Definitions**

In this section:

**(A) Additional renewable fuel**

The term "additional renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in home heating oil or jet fuel.

**(B) Advanced biofuel**

**(i) In general**

The term "advanced biofuel" means renewable fuel, other than ethanol derived

trous oxide, perfluorocarbons,[9] sulfur hexa-fluoride. The Administrator may include any other anthropogenically-emitted gas that is determined by the Administrator, after notice and comment, to contribute to global warming.

**(H) Lifecycle greenhouse gas emissions**

The term ''lifecycle greenhouse gas emissions'' means the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

**(I) Renewable biomass**

The term ''renewable biomass'' means each of the following:

(i) Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested.

(ii) Planted trees and tree residue from actively managed tree plantations on non-federal[10] land cleared at any time prior to December 19, 2007, including land belonging to an Indian tribe or an Indian individual, that is held in trust by the United States or subject to a restriction against alienation imposed by the United States.

(iii) Animal waste material and animal byproducts.

(iv) Slash and pre-commercial thinnings that are from non-federal[10] forestlands, including forestlands belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States, but not forests or forestlands that are ecological communities with a global or State ranking of critically imperiled, imperiled, or rare pursuant to a State Natural Heritage Program, old growth forest, or late successional forest.

(v) Biomass obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, at risk from wildfire.

(vi) Algae.

(vii) Separated yard waste or food waste, including recycled cooking and trap grease.

**(J) Renewable fuel**

The term ''renewable fuel'' means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel.

**(K) Small refinery**

The term ''small refinery'' means a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

**(L) Transportation fuel**

The term ''transportation fuel'' means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except for ocean-going vessels).

**(2) Renewable fuel program**

**(A) Regulations**

**(i) In general**

Not later than 1 year after August 8, 2005, the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B). Not later than 1 year after December 19, 2007, the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after December 19, 2007, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

**(ii) Noncontiguous State opt-in**

**(I) In general**

On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

**(II) Other actions**

In carrying out this clause, the Administrator may—

(aa) issue or revise regulations under this paragraph;

(bb) establish applicable percentages under paragraph (3);

(cc) provide for the generation of credits under paragraph (5); and

(dd) take such other actions as are necessary to allow for the application of the renewable fuels program in a noncontiguous State or territory.

---

[9] So in original. The word ''and'' probably should appear.
[10] So in original. Probably should be ''non-Federal''.

### (iii) Provisions of regulations

Regardless of the date of promulgation, the regulations promulgated under clause (i)—

(I) shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

(II) shall not—

(aa) restrict geographic areas in which renewable fuel may be used; or

(bb) impose any per-gallon obligation for the use of renewable fuel.

### (iv) Requirement in case of failure to promulgate regulations

If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78 percent for calendar year 2006.

### (B) Applicable volumes

#### (i) Calendar years after 2005

##### (I) Renewable fuel

For the purpose of subparagraph (A), the applicable volume of renewable fuel for the calendar years 2006 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
| --- | --- |
| 2006 | 4.0 |
| 2007 | 4.7 |
| 2008 | 9.0 |
| 2009 | 11.1 |
| 2010 | 12.95 |
| 2011 | 13.95 |
| 2012 | 15.2 |
| 2013 | 16.55 |
| 2014 | 18.15 |
| 2015 | 20.5 |
| 2016 | 22.25 |
| 2017 | 24.0 |
| 2018 | 26.0 |
| 2019 | 28.0 |
| 2020 | 30.0 |
| 2021 | 33.0 |
| 2022 | 36.0 |

##### (II) Advanced biofuel

For the purpose of subparagraph (A), of the volume of renewable fuel required under subclause (I), the applicable volume of advanced biofuel for the calendar years 2009 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
| --- | --- |
| 2009 | 0.6 |
| 2010 | 0.95 |
| 2011 | 1.35 |
| 2012 | 2.0 |
| 2013 | 2.75 |
| 2014 | 3.75 |
| 2015 | 5.5 |
| 2016 | 7.25 |
| 2017 | 9.0 |
| 2018 | 11.0 |
| 2019 | 13.0 |
| 2020 | 15.0 |
| 2021 | 18.0 |
| 2022 | 21.0 |

##### (III) Cellulosic biofuel

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of cellulosic biofuel for the calendar years 2010 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of cellulosic biofuel (in billions of gallons): |
| --- | --- |
| 2010 | 0.1 |
| 2011 | 0.25 |
| 2012 | 0.5 |
| 2013 | 1.0 |
| 2014 | 1.75 |
| 2015 | 3.0 |
| 2016 | 4.25 |
| 2017 | 5.5 |
| 2018 | 7.0 |
| 2019 | 8.5 |
| 2020 | 10.5 |
| 2021 | 13.5 |
| 2022 | 16.0 |

##### (IV) Biomass-based diesel

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of biomass-based diesel for the calendar years 2009 through 2012 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of biomass-based diesel (in billions of gallons): |
| --- | --- |
| 2009 | 0.5 |
| 2010 | 0.65 |
| 2011 | 0.80 |
| 2012 | 1.0 |

#### (ii) Other calendar years

For the purposes of subparagraph (A), the applicable volumes of each fuel specified in the tables in clause (i) for calendar years after the calendar years specified in the tables shall be determined by the Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the imple-

mentation of the program during calendar years specified in the tables, and an analysis of—

(I) the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply;

(II) the impact of renewable fuels on the energy security of the United States;

(III) the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and biomass-based diesel);

(IV) the impact of renewable fuels on the infrastructure of the United States, including deliverability of materials, goods, and products other than renewable fuel, and the sufficiency of infrastructure to deliver and use renewable fuel;

(V) the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods; and

(VI) the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices.

The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.

**(iii) Applicable volume of advanced biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of advanced biofuel shall be at least the same percentage of the applicable volume of renewable fuel as in calendar year 2022.

**(iv) Applicable volume of cellulosic biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of cellulosic biofuel established by the Administrator shall be based on the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).

**(v) Minimum applicable volume of biomass-based diesel**

For the purpose of making the determinations in clause (ii), the applicable volume of biomass-based diesel shall not be less than the applicable volume listed in clause (i)(IV) for calendar year 2012.

**(3) Applicable percentages**

**(A) Provision of estimate of volumes of gasoline sales**

Not later than October 31 of each of calendar years 2005 through 2021, the Administrator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an es-

timate, not later than November 30 of each of calendar years 2005 through 2021, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.

**(B) Determination of applicable percentages**

**(i) In general**

Not later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

**(ii) Required elements**

The renewable fuel obligation determined for a calendar year under clause (i) shall—

(I) be applicable to refineries, blenders, and importers, as appropriate;

(II) be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and

(III) subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

**(C) Adjustments**

In determining the applicable percentage for a calendar year, the Administrator shall make adjustments—

(i) to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

(ii) to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

**(4) Modification of greenhouse gas reduction percentages**

**(A) In general**

The Administrator may, in the regulations under the last sentence of paragraph (2)(A)(i), adjust the 20 percent, 50 percent, and 60 percent reductions in lifecycle greenhouse gas emissions specified in paragraphs (2)(A)(i) (relating to renewable fuel), (1)(D) (relating to biomass-based diesel), (1)(B)(i) (relating to advanced biofuel), and (1)(E) (relating to cellulosic biofuel) to a lower percentage. For the 50 and 60 percent reductions, the Administrator may make such an adjustment only if he determines that generally such reduction is not commercially feasible for fuels made using a variety of feedstocks, technologies, and processes to meet the applicable reduction.

**(B) Amount of adjustment**

In promulgating regulations under this paragraph, the specified 50 percent reduction in greenhouse gas emissions from advanced biofuel and in biomass-based diesel may not be reduced below 40 percent. The specified 20

percent reduction in greenhouse gas emissions from renewable fuel may not be reduced below 10 percent, and the specified 60 percent reduction in greenhouse gas emissions from cellulosic biofuel may not be reduced below 50 percent.

**(C) Adjusted reduction levels**

An adjustment under this paragraph to a percent less than the specified 20 percent greenhouse gas reduction for renewable fuel shall be the minimum possible adjustment, and the adjusted greenhouse gas reduction shall be established by the Administrator at the maximum achievable level, taking cost in consideration, for natural gas fired corn-based ethanol plants, allowing for the use of a variety of technologies and processes. An adjustment in the 50 or 60 percent greenhouse gas levels shall be the minimum possible adjustment for the fuel or fuels concerned, and the adjusted greenhouse gas reduction shall be established at the maximum achievable level, taking cost in consideration, allowing for the use of a variety of feedstocks, technologies, and processes.

**(D) 5-year review**

Whenever the Administrator makes any adjustment under this paragraph, not later than 5 years thereafter he shall review and revise (based upon the same criteria and standards as required for the initial adjustment) the regulations establishing the adjusted level.

**(E) Subsequent adjustments**

After the Administrator has promulgated a final rule under the last sentence of paragraph (2)(A)(i) with respect to the method of determining lifecycle greenhouse gas emissions, except as provided in subparagraph (D), the Administrator may not adjust the percent greenhouse gas reduction levels unless he determines that there has been a significant change in the analytical methodology used for determining the lifecycle greenhouse gas emissions. If he makes such determination, he may adjust the 20, 50, or 60 percent reduction levels through rulemaking using the criteria and standards set forth in this paragraph.

**(F) Limit on upward adjustments**

If, under subparagraph (D) or (E), the Administrator revises a percent level adjusted as provided in subparagraphs (A), (B), and (C) to a higher percent, such higher percent may not exceed the applicable percent specified in paragraph (2)(A)(i), (1)(D), (1)(B)(i), or (1)(E).

**(G) Applicability of adjustments**

If the Administrator adjusts, or revises, a percent level referred to in this paragraph or makes a change in the analytical methodology used for determining the lifecycle greenhouse gas emissions, such adjustment, revision, or change (or any combination thereof) shall only apply to renewable fuel from new facilities that commence construction after the effective date of such adjustment, revision, or change.

**(5) Credit program**

**(A) In general**

The regulations promulgated under paragraph (2)(A) shall provide—
    (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);
    (ii) for the generation of an appropriate amount of credits for biodiesel; and
    (iii) for the generation of credits by small refineries in accordance with paragraph (9)(C).

**(B) Use of credits**

A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(C) Duration of credits**

A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

**(D) Inability to generate or purchase sufficient credits**

The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created—
    (i) achieves compliance with the renewable fuel requirement under paragraph (2); and
    (ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

**(E) Credits for additional renewable fuel**

The Administrator may issue regulations providing: (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports additional renewable fuels specified by the Administrator; and (ii) for the use of such credits by the generator, or the transfer of all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(6) Seasonal variations in renewable fuel use**

**(A) Study**

For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

**(B) Regulation of excessive seasonal variations**

If, for any calendar year, the Administrator of the Energy Information Administration, based on the study under subparagraph (A), makes the determinations speci-

fied in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

**(C) Determinations**

The determinations referred to in subparagraph (B) are that—

(i) less than 25 percent of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

(ii) a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

(iii) promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

**(D) Periods**

The 2 periods referred to in this paragraph are—

(i) April through September; and

(ii) January through March and October through December.

**(E) Exclusion**

Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 7543(b) of this title shall not be included in the study under subparagraph (A).

**(F) State exemption from seasonality requirements**

Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 7543(b) of this title or any State dependent on refineries in such State for gasoline supplies.

**(7) Waivers**

**(A) In general**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)—

(i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

(ii) based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

**(B) Petitions for waivers**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a petition for a waiver of the requirements of paragraph (2) within 90 days after the date on which the petition is received by the Administrator.

**(C) Termination of waivers**

A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

**(D) Cellulosic biofuel**

(i) For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year. For any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

(ii) Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

(iii) Eighteen months after December 19, 2007, the Administrator shall promulgate regulations to govern the issuance of credits under this subparagraph. The regulations shall set forth the method for determining the exact price of credits in the event of a waiver. The price of such credits shall not be changed more frequently than once each quarter. These regulations shall include such provisions, including limiting the credits' uses and useful life, as the Administrator deems appropriate to assist market liquidity and transparency, to provide appropriate certainty for regulated entities and renewable fuel producers, and to limit any potential misuse of cellulosic biofuel credits to reduce the use of other renewable fuels, and for such other purposes as the Administrator determines will help achieve the goals of this subsection. The regulations shall limit the number of cellulosic biofuel credits for any calendar year to the minimum applicable volume (as reduced under this subparagraph) of cellulosic biofuel for that year.

A6

**(E) Biomass-based diesel**

**(i) Market evaluation**

The Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall periodically evaluate the impact of the biomass-based diesel requirements established under this paragraph on the price of diesel fuel.

**(ii) Waiver**

If the Administrator determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed 15 percent of the applicable annual requirement for biomass-based diesel. For any calendar year in which the Administrator makes a reduction under this subparagraph, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

**(iii) Extensions**

If the Administrator determines that the feedstock disruption or circumstances described in clause (ii) is continuing beyond the 60-day period described in clause (ii) or this clause, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, may issue an order to reduce, for up to an additional 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed an additional 15 percent of the applicable annual requirement for biomass-based diesel.

**(F) Modification of applicable volumes**

For any of the tables in paragraph (2)(B), if the Administrator waives—

(i) at least 20 percent of the applicable volume requirement set forth in any such table for 2 consecutive years; or

(ii) at least 50 percent of such volume requirement for a single year,

the Administrator shall promulgate a rule (within 1 year after issuing such waiver) that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies, except that no such modification in applicable volumes shall be made for any year before 2016. In promulgating such a rule, the Administrator shall comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii).

**(8) Study and waiver for initial year of program**

**(A) In general**

Not later than 180 days after August 8, 2005, the Secretary of Energy shall conduct for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

**(B) Required evaluations**

The study shall evaluate renewable fuel—

(i) supplies and prices;

(ii) blendstock supplies; and

(iii) supply and distribution system capabilities.

**(C) Recommendations by the Secretary**

Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

**(D) Waiver**

**(i) In general**

Not later than 270 days after August 8, 2005, the Administrator shall, if and to the extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

**(ii) No effect on waiver authority**

Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

**(9) Small refineries**

**(A) Temporary exemption**

**(i) In general**

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

**(ii) Extension of exemption**

**(I) Study by Secretary of Energy**

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

**(II) Extension of exemption**

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

**(B) Petitions based on disproportionate economic hardship**

**(i) Extension of exemption**

A small refinery may at any time petition the Administrator for an extension of

the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

**(ii) Evaluation of petitions**

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

**(iii) Deadline for action on petitions**

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

**(C) Credit program**

If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regulations promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

**(D) Opt-in for small refineries**

A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A).

**(10) Ethanol market concentration analysis**

**(A) Analysis**

**(i) In general**

Not later than 180 days after August 8, 2005, and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

**(ii) Scoring**

For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

**(B) Report**

Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

**(11) Periodic reviews**

To allow for the appropriate adjustment of the requirements described in subparagraph (B) of paragraph (2), the Administrator shall conduct periodic reviews of—

(A) existing technologies;

(B) the feasibility of achieving compliance with the requirements; and

(C) the impacts of the requirements described in subsection (a)(2)[11] on each individual and entity described in paragraph (2).

**(12) Effect on other provisions**

Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas, or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 7475) of this chapter. The previous sentence shall not affect implementation and enforcement of this subsection.

[11] So in original. Subsection (a) does not contain a par. (2).